**Sherman H. SKOLNICK et al.,**
**Plaintiffs,**

v.

**STATE ELECTORAL BOARD OF ILLINOIS, Defendant,**

William L. Springer et al., Intervenors.

No. 69 C 755.

United States District Court,
N. D. Illinois, E. D.

Sept. 21, 1971.

Order Nov. 5, 1971.

Dissenting Opinion Nov. 10, 1971.

Memorandum Nov. 15, 1971.

Sherman H. Skolnick and others pro se.

William J. Scott, Atty. Gen. of Ill., for defendant.

Jerome H. Torshen, Ltd., Chicago, Ill., for intervenors, W. Robert Blair, Henry J. Hyde and Edward Madigan.

Before CASTLE, Senior Circuit Judge, CAMPBELL, Senior District Judge, and DECKER, District Judge.

DECKER, District Judge.

This is the latest chapter in the quest to apportion Illinois' twenty-four Congressional districts so that they comply with the constitutional mandate of one man one vote. Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964). In 1961 the Illinois General Assembly established districts on the basis of population figures derived from the 1960 decennial census. Ill.Rev.Stat. ch. 46, § 156f.1. The sizes of the districts varied substantially, the largest having a population almost twice as great as the smallest. The population disparity in the 1961 map was challenged in the state court, and in People ex rel. Scott v. Kerner, 32 Ill.2d 539, 208 N.E.2d 561 (1965), it was held unconstitutional. Jurisdiction was retained in order to oversee the drawing of a provisional map for the 1966 Congressional election which complied with the Constitution.

At the time the state court declared the 1961 map unconstitutional, there was pending in this court, before the same panel of three judges as is now convened, a suit to compel the reapportionment of Illinois' Congressional districts. With the aid of the parties to the litigation, this court adopted a provisional map which was to be used for the elections beginning in 1966. Kirby v. Illinois State Electoral Board, 251 F.Supp. 908 (N.D.Ill.1965). The Illinois Supreme Court gave its approval to that plan. People ex rel. Scott v. Kerner, 33 Ill.2d 460, 211 N.E.2d 736 (1965). It was drawn up largely on the basis of the 1961 map, the court using the existing twenty-four districts as a nucleus, and then modifying district lines to comply as nearly as practicable with the constitutional requirement of numerical equality. The result was a plan in which the population of the largest district was 7.5 per cent above the average district, and the smallest district was 6.1 per cent below the average district.

Following the 1969 Supreme Court decisions in two Congressional reapportionment cases, Kirkpatrick v. Preisler, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969), and Wells v. Rockefeller, 394 U.S. 542, 89 S.Ct. 1234, 22 L.Ed.2d 535 (1969), plaintiffs Sherman H. Skolnick and Harriet Sherman filed the present lawsuit to test the constitutionality of the 1965 plan. The case was heard by the same three-judge panel which participated in the Kirby case. After considering the 1965 plan in relation to the requirement of mathematical exactness as set out in Kirkpatrick and Wells, the court held that it was unconstitutional. Skolnick v. Illinois State Electoral Board, 307 F.Supp. 698 (N.D.Ill.1969) (per curiam). The court permitted the 1970 Congressional election to proceed under the 1965 plan. Looking forward to the 1972 election, it issued the following order:

"This court assumes that the General Assembly of Illinois will, during its legislative session in the first half of 1971, enact a complete and constitutionally valid plan of reapportionment for election of Members to the United States House of Representatives from Illinois. Defendant is hereby ordered to present to this court on or before July 1, 1971 such duly enacted plan of reapportionment. Upon failure so to do this court shall undertake appropriate relief." 307 F. Supp. at 700.

However, a new map was never adopted by the Assembly. Representative Edward Madigan, the Chairman of the House Committee on Reapportionment, testified that a map drawn up for his

committee was approved by the House of Representatives on June 28, 1971, by the margin of 148–1. The Senate adjourned on June 30, 1971, however, without taking any final action on the House-approved bill. Because the legislature failed to adopt its own map, it fell upon this court to effect a constitutionally-acceptable reapportionment scheme.

Plaintiffs Skolnick and Sherman, appearing *pro se*, submitted a proposed map to the court for its consideration. Defendant Illinois State Electoral Board had no map of its own, since the legislature had not adopted one. Therefore, upon the invitation of the court, interested parties were permitted to intervene and submit proposed maps. One party was the Illinois Congressional Delegation, representing the twenty-four incumbent members of Congress from the State of Illinois. Another map was presented by Mr. Aram A. Hartunian, appearing *pro se*. The final intervening group was comprised of Representatives W. Robert Blair, Henry J. Hyde and Edward R. Madigan of the Illinois General Assembly. Their map was, with one minor exception, the same as the one passed by the Illinois House and introduced into the Senate earlier this year.

The court considered only the maps submitted by plaintiffs and the above-mentioned intervenors. However, it permitted other interested parties to file observations and suggestions with regard to the four proposed plans. It received such suggestions from the Illinois Republican State Central Committee and the Republican Central Committee of Cook County, from the Illinois Democratic State Central Committee and the Democratic Central Committee of Cook County,[1] and from the Democratic Chairmen of the 22nd Congressional District. Finally, the court received the comments of Mr. James Chapman, representing the

Chicago Bar Association, the Amicus Curiae. Mr. Chapman's comments did not receive the prior approval of the Chicago Bar Association, thus they are to be considered as his personal remarks only.

A hearing was conducted in this matter on September 2 and 3, 1971. On the first day, the four map proponents presented evidence and made arguments in support of their respective plans. On the second day, the defendant, the amicus, and the intervenors who did not submit maps were permitted to offer their arguments in support of and in opposition to the four maps. By the end of the hearing it had become clear that each of the four maps presented population districts which were substantially equal, and that the variations in district boundaries were explainable by the fact that each map-maker had taken certain nonpopulation factors into account in drawing up his map.

In one of the most recent cases on the subject of Congressional reapportionment, Kirkpatrick v. Preisler, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969), the court rejected the notion that there was a percentage population variance which could be considered *de minimus*. In order to justify any population variance, no matter how small, the court required the proponent of a particular map to demonstrate either that the variances were unavoidable despite a good-faith effort to achieve absolute equality, or that there was some factor which justified the variances.

■ It became evident at the hearing that the primary factor influencing each map-maker in drawing up his respective map was equality of population. In no case did any of the proposed districts vary more than one per cent above or below the mathematical average of 463,082 inhabitants.[2] Other factors were clearly

---

1  State Senator Cecil Partee attempted to submit a map as an exhibit to his comments and suggestions. However, his map was successfully objected to as not properly submitted, hence it was not before the court for its consideration.

2.  Within the less than one per cent variance, we specifically find that the order

of deviation ranks as follows, from smallest to largest:
1. Skolnick-Sherman.
2. Illinois Congressional Deleg.
3. Blair-Hyde.
4. Hartunian.

secondary. By coming within one percentage point of the mathematical average, each of the four clearly made a good-faith effort to avoid any variance and therefore complied with *Kirkpatrick*. Obviously, no map can achieve absolute mathematical perfection. Changes have already occurred since the taking of the census by reason of births, deaths, and population mobility. However, within the context of the figures supplied by the Bureau of the Census, the variances in each plan are so small that the only way to distinguish among them is to consider what non-population factors went into the drawing of each.

■ Plaintiff Skolnick and his expert witness testified that the only considerations other than population which governed the drawing of his map were that the districts be compact and contiguous. However, there is no requirement of contiguity and compactness imposed by federal law. See Wood v. Broom, 287 U.S. 1, 53 S.Ct. 1, 77 L.Ed. 131 (1932); Preisler v. Secretary of State of Missouri, 257 F.Supp. 953, 955, n. 2 (W. D.Mo.1966), aff'd *per curiam*, 385 U.S. 450, 87 S.Ct. 613, 17 L.Ed.2d 511 (1967); Meeks v. Avery, 251 F.Supp. 245, 250 (D.Kans.1966); Park v. Faubus, 238 F. Supp. 62, 65, n. 2 (E.D.Ark.1965); Clark v. Carter, 218 F.Supp. 448, 449 (E.D.Ky.1963).

■ The shortcoming of plaintiffs' map is that it ignores traditional boundaries of political subdivisions for the sole purpose of drawing compact, contiguous districts. Certainly compactness and contiguity are desirable features. Indeed, all four maps have districts which are compact and contiguous. However, they are not required by the Constitution, and to ignore effective representation for the sake of district symmetry is not proper. There are values to be preserved in drawing districts which in some way attempt to follow boundaries of cities, townships, counties, etc. It became apparent upon cross-examination of plaintiffs' expert that, at least in Cook

County, some effort was made to observe traditional boundaries of political subdivisions. However, plaintiffs' too rigid alherence to the boundaries of census tracts, without regard to traditional political boundaries, requires that their proposed map be rejected.

The Hartunian map is concerned primarily with one non-population factor, the encouragement of closely-contested, or "swing" districts. Mr. Hartunian has devised a map based largely upon vote results in the 1968 and 1970 Congressional elections. The districts have been drawn so that seventeen are "safe" districts, i. e. districts which will almost certainly elect a Democrat (seven) or a Republican (ten). The remaining seven districts are represented as having been drawn so that neither of the two major parties would enjoy a predictable majority. In these seven districts it was hoped that the bloc of independent voters would, according to the political climate, sway the election for one party or the other.

■ Implicit in the Hartunian plan is an aversion for "safe" Congressional seats. The proponent of the map has argued that there is no place in a reapportionment scheme for the protection of incumbents from vigorous contests for reelection. However, the fact that a given plan may minimize the number of close contests in a Congressional election does not of itself invalidate that plan. See Ely v. Klahr, 403 U.S. 108, 112, n. 5, 91 S.Ct. 1803, 29 L.Ed.2d 352 (1971); Burns v. Richardson, 384 U.S. 73, 89, n. 16, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966); *contra*, League of Nebraska Municipalities v. Marsh, 242 F.Supp. 357, 360 (D.Neb.1965), *appeal dismissed*, 382 U.S. 1021, 86 S.Ct. 642, 15 L.Ed.2d 537 (1966).

■ No authority has been cited to the effect that partisan balance is required in each district when devising a map. Indeed, the Hartunian map invites the court to speculate on the out-

come of future elections in Illinois' twenty-four Congressional districts, based upon voting figures from the last two elections. While Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), and its progeny thrust the court into the "political thicket" of reapportionment, it did not to our knowledge invite the court to become a prognosticator of election results. Given the vagaries of electoral politics, and given the imperfect data available for predicting the outcome of elections, it would be unwise for the court to establish as a criterion for Congressional redistricting the establishment of politically-balanced districts. Therefore, the Hartunian map must be rejected.

The map of the Illinois Congressional Delegation was, as its name suggests, drawn up by the twenty-four members of Congress from Illinois. The Delegation's map was first introduced as a reapportionment bill in the Illinois House of Representatives, where it was voted down by the Committee on Reapportionment. The primary non-population factor taken into account in drawing the Delegation map was the so-called "core" principle, namely the conscious adherence to previous district boundaries, with concessions made to pre-existing boundaries only when population changes so require. The argument advanced in support of the core principle is that the court in applying the principle is required to involve itself as little as possible in the "political" task of reapportionment: it merely takes the existing map as it finds it and alters a few boundary lines to accommodate population changes.

█ To the extent the core of the 1965 Congressional map was changed to create the proposed Delegation map, that change was effected by the incumbent congressmen who revamped the boundaries of the districts and then submitted the map to the Delegation's expert, Dr. Godwin, for his comparison with 1970 census data. Of course, there was no evidence introduced of the drafter's drawing up district boundaries to solidify their own partisan electoral support. And, as indicated in regard to the Hartunian map, there appears to be no constitutional infirmity in drawing an otherwise valid map which protects incumbents. Nevertheless, there are compelling reasons why the core principle should not be accorded the status of the primary and controlling non-population factor which must dictate our choice in this matter.

The core of the existing Congressional map, the one used in the last election, is almost certainly outmoded at this date. As Dr. Godwin testified, the 1965 provisional map was based upon the 1961 map originally drawn up by the legislature. The 1961 map was held unconstitutional in People ex rel. Scott v. Kerner, supra, because of the great population variance among the districts. In drawing up the 1965 map, which was only provisional, the court took the nucleus of the 1961 map, but changed it considerably to bring the districts more into equality of size. In turn, however, new Supreme Court law rendered even the 1965 plan unconstitutional, again because of the population variance among districts. Skolnick v. Illinois State Electoral Board, supra.

Under these circumstances, it is difficult to imagine any justification for using the existing core as a starting point for a new map. The core was originally drawn ten years ago, based upon the 1960 census. It was held unconstitutional, redrawn provisionally, and again held unconstitutional. It is sophistry to claim now that the core is a creation of the state legislature which should be changed slightly but preserved in its essence. It has been changed once, considerably, by this court, and it would be changed considerably again if the Delegation map were adopted, so that it can in no way properly be called the "legislature's" map.

Most important, the 1970 census figures are now available. They indicate significant population changes over the past decade. For instance, the City of Chicago declined in population by 5.2 per cent during the last ten years. More dramatically, during the same period suburban Cook County increased in population by 34.5 per cent. The changes suggest not only a shift of population from the city to its surrounding suburbs, but also an influx of people to the suburbs from outside Cook County. Under these circumstances, there is little justification for adhering to the core of a map drawn up using outmoded census figures.[3] The core principle may have been followed in a rough way in drawing up the 1965 provisional map, when the 1960 census figures were the only ones available. Now, however, the 1970 census figures are available, and there is no compelling reason to apply them to the 1961–1965 core.

We are not persuaded by the rationale of the dissent of our distinguished colleague Senior District Judge Campbell. We perceive nothing in our previous rulings which affords a basis for his premise that our jurisdiction in this matter is limited to arriving at a reapportionment plan based on outmoded cores. Nor, in our order inviting interested parties to submit reapportionment proposals, did we require the proposals to begin with the 1965 core. The order of July 13, 1971, was unqualified, and Judge Campbell's assertion that the parties were invited "to validate our provisional plan" can only represent his personal interpretation of the meaning of our order.

■ Judge Campbell, apparently relying on his long experience, has attempted to predict the political consequences of the acceptance of the Blair proposal. We suggest that any shift of the boundary lines of existing districts in order to equalize population is bound to have some political consequences. This is true whether the lines are shifted wittingly by incumbent congressmen for the purpose of protecting their seats or unwittingly for the sole purpose of achieving a compact district. We prefer not to indulge in any judicial speculation as to the future voting patterns in any particular district, new or old. Political prognostication is a dangerous and futile exercise.

Despite the eloquent plea made by our brother Campbell, we find the Illinois Congressional Delegation map to be unacceptable.

■ The Blair map was drawn up by a political scientist and an urban planning firm retained by the Illinois House Committee on Reapportionment. The main non-population factor taken into account in drawing up the Blair map was the recognition of the existence of metropolitan communities and existing county lines. Maryland Citizens Committee for Fair Congressional Redistricting, Inc. v. Tawes, 253 F.Supp. 731, 735 (D.Md.), aff'd sub nom., Alton v. Tawes, 384 U.S. 315, 86 S.Ct. 1590, 16 L.Ed.2d 586 (1966) (per curiam). For instance, seven out of the eight Chicago districts are wholly contained within the city limits, and three out of the four suburban Cook County Districts are located outside the city but within the county. Only one district, the Third, overlaps between the city and the suburbs. Downstate, the boundaries of the remaining twelve districts follow, wherever possible, county lines. It is clear that the Blair map is a good-faith effort to adhere to existing communities of interest and existing political boundaries.

Representative Madigan testified that his map did not take into account the residence of incumbent Congressmen. He also testified that the drafters of the Blair map were not instructed to take

3. Or, to paraphrase a comment made by counsel for defendant, the court should avoid spoiling a brand new apple by using an old core.

into account the compactness and contiguity of the districts. However, even a cursory examination of the Blair map shows that the twenty-four districts are substantially compact and contiguous. The unaesthetic appearance of certain boundaries does not detract from the fact that equality of population has been substantially achieved. Kirkpatrick v. Preisler, 394 U.S. 526, at 536, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969).

Moreover, the map did get the overwhelming approval of one house of the legislature. It would be unwise to attempt to guess the fate of the map in the upper house, had it been brought to a vote. However, the approval of the bill in the state House of Representatives is at least probative of the fact that the Blair map had substantial bipartisan support among certain legislators.[4]

The largest district on the Blair map has only 6930 more inhabitants than the smallest district. The two districts at the extremes deviate only three-quarters of a per cent from the numerical average. Thus, it is clear that the primary consideration, equality of districts, was sufficiently achieved. Moreover, it was achieved without substantially impairing recognized political boundaries and communities of interest.

■ It has been suggested, particularly by the Democratic Chairmen of the 22nd Congressional District, that the court take it upon itself to alter the boundaries of one or more districts in order to include or exclude certain political subdivisions. This the court refuses to do. Perhaps the Blair map could be improved upon, making the districts more congruous as to some political subdivision boundaries. However, in this instance, it would not be a proper judicial task to undertake. The districts in the Blair map are already so near to being equal in population that it would serve no useful purpose to further refine them. Moreover, the drafters of the Blair map followed, as nearly as possible, existing political boundaries, and it would be unwise for the court merely to substitute its choice of different political boundaries. Therefore, the Blair map will be accepted without judicial modification.

For all the foregoing reasons, the Blair-Hyde-Madigan plan of reapportionment, as set out in Appendix 2 and Appendix 3, is found to meet all federal constitutional requirements and is hereby approved and declared to be the Congressional map for the State of Illinois, beginning with the 1972 election to the United States House of Representatives and continuing thereafter until Illinois Congressional districts are reapportioned in accordance with law.

### Judgment Order

The foregoing memorandum opinion is hereby adopted as our findings of fact and conclusions of law.

It is therefore ordered that the reapportionment plan as set out in Appendix 2 and Appendix 3 [5] attached to our memorandum opinion be, and the same is, declared to meet all federal constitutional requirements; and it is further ordered that said plan of reapportionment govern the nomination and election of members of the House of Representatives of the United States Congress beginning with the 1972 primary and election and continuing thereafter until Illinois Congressional districts are reapportioned in accordance with law.

It is further ordered that the defendant, State Electoral Board of Illinois, in the performance of its duties and functions under the Illinois election laws,

---

4. The record is silent as to the reasons for the near unanimous support for the Blair map in the House, and it would be sheer speculation to argue, as has been done by our brother Campbell, that the only purpose for its passage was so that it could be used as a vehicle for negotiations in the Senate.

5. Appendix 1, also attached, is a summary of the population data for the twenty-four Congressional districts.

be governed by and comply with said plan of reapportionment accordingly.

## APPENDIX 1
### POPULATION DATA FOR TWENTY-FOUR CONGRESSIONAL DISTRICTS

| District | Population | % Deviation From Ideal |
|---|---|---|
| 1 | 462,434 | —.13% |
| 2 | 464,792 | +.36% |
| 3 | 461,346 | —.37% |
| 4 | 464,446 | +.29% |
| 5 | 459,731 | —.72% |
| 6 | 464,763 | +.36% |
| 7 | 464,269 | +.25% |
| 8 | 462,076 | —.21% |
| 9 | 463,791 | +.01% |
| 10 | 462,121 | —.20% |
| 11 | 461,084 | —.43% |
| 12 | 461,054 | —.43% |
| 13 | 463,096 | +.00% |
| 14 | 465,029 | +.42% |
| 15 | 462,969 | —.02% |
| 16 | 461,719 | —.29% |
| 17 | 462,943 | —.03% |
| 18 | 463,155 | +.00% |
| 19 | 462,085 | —.21% |
| 20 | 463,551 | +.01% |
| 21 | 464,693 | +.34% |
| 22 | 464,121 | +.22% |
| 23 | 462,960 | —.02% |
| 24 | 465,017 | +.42% |

## APPENDIX 2

### LEGAL DESCRIPTIONS FOR TWENTY-FOUR CONGRESSIONAL DISTRICTS

District No. 1 shall be comprised of all of Census Tracts 4212, 4208, 4209, 6906, 4303, 4304, 6907, 6908, 6905, 4310, 4501, 6915, 6914, 4402, 4401, 4502, 4407, 4409, 4904, 4701, 4802, 4803, 5001, 4905, 4908, 4906, 7301, 4902, 4903, 7115, 4901, 4405, 4406, 7109, 4404, 4403, 6913, 6912, 7101, 6910, 6911, 6813, 6904, 6903, 6909, 4408, 4306, 4305, 4301, 4302, 4211, 4210, 4201, 4202, 4203, 4204, 4205, 4206, 4207, 4111, 4110, 4112, 4113, 4114, 4101, 4102, 4103, 4104, 4105, 4106, 4107, 4108, 4109, 3901, 3902, 3903, 3904, 3905, 3906, 3907, 3604, 3601, 3602, 3603, 3605, 3801, 3511, 3510, 3512, 3513, 3514, 4309, 3804, 3805, 3803, 3807, 3808, 3809, 3810, 3811, 3815, 3814, 3813, 3812, 4001, 4003, 3806, 3816, 3817, 4002, 3820, 3819, 3818, and 3802 in the City of Chicago in Cook County.

District No. 2 shall be comprised of all of Census Tracts 7113, 7201, 7203, 7303, 7202, 7304, 7306, 7307, 7207, 7206, 7505, 7502, 7501, 7506, 5302, 5303, 5304, 4912, 4913, 4911, 4909, 4914, 5305, 4910, 7305, 4907, 6715, 7302, 5202, 5203, 5204, 5205, 5206, 5501, 5502, 5104, 5105, 5102, 5103, 5101, 5201, 4805, 4804, 4606, 4607, 4608, 4609, 4610, 4601, 4602, 4603, 4604, 4314, 4315, 5401, 5003, 5002, 4313, 4307, 4308, 4312, 4605, 4503, 4801, 4311, 5306, 5301, 7114, 7110, 7111, 7112, 7105, 7106, 7107, 7108, 7104, 7103, 7102, 6720, 6719, 6601, 6718, 6814, 6716, 6717, 6714, 6713, 6712, 6711, 6708, 6707, 6705, 6306, 6704, 6705, 6703, 6702, and 6602 in the City of Chicago in Cook County.

District No. 3 shall be comprised of all of the Townships of Thornton and Calumet in Cook County; and all of Census Tracts 7204, 7205, 7401, 7402, 7403, 7404, 7503, 7504, 7003, 7004, 7002, 7001, 6505, 6504, 6611, 6610, 6609, 6503, 6605, 6608, 7005, 6607, and 6606 in the City of Chicago in Cook County; and all of Worth Township in Cook County, except the Villages of Chicago Ridge, Worth, Crestwood, and Bridgeview, and the City of Palos Heights.

District No. 4 shall be comprised of all of the Townships of Lyons, Palos, Lemont, Orland, Bremen, Rich, and Stickney in Cook County; and all of the Villages of Bridgeview, Chicago Ridge, Worth and Crestwood in Worth Township in Cook County; and the City of Palos Heights in Worth Township in Cook County; and the part of the Village of Homewood that is in Bloom Township in Cook County; and the part of the Village of Flossmoor that is in Bloom Township in Cook County; and all of Census Tracts 8190, 8189, 8188, 8187, 8186, 8185, 8180, 8184, 8181, 8182, 8179, 8183, 8169; and Block Groups 4 and 5 in Census Tract 8171; and all of Census

Tract 8168 in Proviso Township in Cook County.

District No. 5 shall be comprised of all of Census Tracts 4007, 4008, 6901, 4006, 6902, 6809, 6812, 6811, 6810, 6710, 6709, 6806, 6807, 6808, 6802, 6801, 4004, 4005, 5610, 5611, 5612, 5613, 6203, 6204, 6309, 6404, 6403, 6402, 6401, 6502, 6501, 6604, 6603, 6405, 6406, 6407, 6408, 5609, 5608, 5607, 5602, 5603, 5604, 5605, 5606, 5703, 5704, 5705, 6201, 5810, 6303, 5811, 6302, 6304, 6305, 6115, 6301, 6116, 6001, 6002, 6003, 6004, 6005, 6006, 6007, 6008, 6009, 6010, 6011, 6012, 6013, 6014, 6015, 6016, 6101, 6102, 6103, 6104, 6105, 6106, 6107, 6108, 6109, 6110, 6111, 6112, 6113, 6114, 6119, 6120, 6121, 6122, 6803, 6804, 6805, 6701, 5901, 5902, 5903, 5904, 5905, 5906, 5907, 3704, 3703, 3702, 3701, 3406, 3405, 3404, 3403, 3515, 3505, 3506, 3507, 5801, 5805, 5806, 5807, 5808, 5701, 5702, 5601, 5802, 5803, 5804, 5809, 6118, 6117, 3020, 3018, 3017, 3016, 3007, 3503, 3504, 3508, 3502, 3501, 3509, 6202, 6307, 6308, and 3019 in the City of Chicago in Cook County.

District No. 6 shall be comprised of all of the Townships of Leyden, River Forest, Oak Park, Cicero, Berwyn, Riverside, and Norwood Park in Cook County; and all of Census Tract 7606 in the City of Chicago in Cook County; and all of Census Tracts 8401, 8402, and 7701 in Addison Township in Du-Page County; and all of Proviso Township in Cook County except for Census Tracts 8190, 8189, 8188, 8187, 8186, 8185, 8180, 8184, 8181, 8182, 8179, 8183, 8169, 8168, and Block Groups 4 and 5 in Census Tract 8171.

District No. 7 shall be comprised of all of Census Tracts 2419, 2420, 2421, 2422, 2423, 2424, 2425, 2434, 2433, 2432, 2431, 2430, 2429, 812, 2428, 2803, 2804, 2805, 2806, 2807, 2808, 2809, 2810, 2811, 2812, 2813, 2814, 2815, 2816, 2817, 2701, 2702, 2707, 2708, 2828, 2829, 2830, 2831, 2832, 2833, 2834, 2835, 2836, 2837, 2838, 2839, 2840, 2841, 2842, 3301, 3302, 3303, 3304, 3305, 3401, 3402, 3101, 3102, 3103, 3104, 3105, 3106, 3107, 3108, 3109, 3110, 3111, 2709, 2710, 2317, 2316, 2315, 2601, 2704, 2703, 2818, 2706, 2711, 2712, 2713, 2714, 2608, 2705, 2418, 2435, 2436, 2801, 2802, 2410, 2426, 2715, 2820, 2821, 2822, 2823, 2824, 2825, 2826, 2827, 3112, 3113, 3114, 3115, 3001, 3002, 3003, 3010, 3011, 3012, 3013, 3014, 3009, 2901, 2902, 2903, 2719, 2819, 2718, 2717, 2716, 2904, 2913, 2914, 2915, 2843, 2916, 2917, 2918, 2919, 3008, 3015, 2905, 2912, 3206, 3205, 3204, 3203, 3202, 3201, 807, 808, 819, 809, 818, 817, 815, 813, 814, 816, 3006, 3005, 2925, 2924, 2923, 2927, 2926, 2909, 2921, 2922, 2910, 2911, 2906, 2920, 3004, 2609, 2907; and Block Group 2 of Census Tract 2412, in the City of Chicago in Cook County.

District No. 8 shall be comprised of all of Census Tracts 806, 703, 704, 705, 707, 708, 709, 710, 711, 719, 720, 2401, 2402, 2403, 2220, 2413, 2415, 2416, 2219, 2217, 2218, 2221, 2414, 2417, 2518, 2515, 2519, 2520, 2521, 2522, 2523, 2524, 2602, 2603, 2604, 2607, 2606, 2605, 2908, 2610, 2305, 2304, 2229, 2006, 2005, 1910, 2004, 2209, 2302, 2227, 2211, 2212, 2226, 2303, 2301, 2408, 2225, 2213, 2214, 2215, 2216, 2204, 2203, 2201, 2003, 2208, 2002, 2207, 2206, 2205; and Block Group 1 of Census Tract 2412; and all of Census Tracts 2411, 2210, 1709, 1801, 1802, 1803, 2228, 2224, 1904, 1905, 1906, 1907, 2407, 1911, 1912, 1913, 1914, 2501, 2502, 2503, 2504, 2505, 2506, 2507, 2508, 2509, 2510, 2511, 2512, 2513, 2306, 2307, 2308, 2309, 2310, 2311, 2312, 2313, 2314, 2318, 2514, 712, 2516, 2517, 2409, 2427, 2223, 2222, 2406, 2405, and 2404 in the City of Chicago in Cook County.

District No. 9 shall be comprised of all of Census Tracts 101, 102, 103, 104, 105, 106, 107, 108, 109, 301, 302, 303, 304, 305, 306, 307, 308, 309, 201, 202, 203, 204, 205, and 206; and Block Groups 1 and 6 in Census Tract 207; and all of Census Tracts 209, 401, 404, 405, 406, 513, 514, 515, 601, 602, 603, 604, 605, 606, 607, 608, 609, 610, 611, 612, 613, 614, 615, 616, 617, 618, 619, 620, 621, 622, 623, 624, 625, 626, 627, 628, 629, 630, 631, 632, 313, 314, 315, 316, 317, 318, 319, 320, 321, 310, 311, 312, 634, 633, 702, 718, 805, 713, 716, 717, 804, 810, 803, 715, 714, 701, 802,

801, 811, 706, 409, 410, and 501 in the City of Chicago in Cook County.

District No. 10 shall be comprised of all of the Townships of Evanston, New Trier, Northfield, Maine, and Niles in Cook County.

District No. 11 shall be comprised of all of Census Tracts 901, 902, 903, 1001, 1002, 1003, 1004, 1005, 1006, 1007, 1201, 1202, 1203, 1204, 1101, 1102, 1103, 1104, 1105, 1302, 1502, 1503, 1504, 1505, 1506, 1512, 1701, 1702, 1703, 1704, 1705, 1706, 1707, 1708, 1711, 1710, 7601, 7603, 7604, 7605, 7602, 1408, 1603, 1604, 1605, 1606, 1607, 1608, 1609, 1610, 1611, 1612, 1613, 2102, 2103, 2104, 2105, 2106, 2001, 1405, 1406, 1407, 1402, 1403, 1602, 1509, 1901, 1510, 1601, 1404, 1501, 1508, 1507, and 1909; and Block Groups 2, 3, 4, and 5 in Census Tract 207; and all of Census Tracts 208, 402, 403, 407, 408, 502, 503, 504, 505, 1511, 1903, 506, 507, 508, 509, 510, 511, 512, 2101, 2107, 2108, 2202, 1902, 1908, 1401, 1304, 1301, 1303, 1305, and 2109 in the City of Chicago in Cook County.

District No. 12 shall be comprised of all of the Townships of Wheeling, Elk Grove, Palatine, Schaumburg, Hanover, and Barrington in Cook County; and all of the Townships of Ela, Vernon, Deerfield, West Deerfield, and Libertyville in Lake County.

District No. 13 shall be comprised of all of the Townships of Marengo, Riley, Coral, Dorr, Grafton, Nunda, and Algonquin in McHenry County; and all of Lake County, except the townships of Ela, Vernon, Deerfield, West Deerfield, and Libertyville; and all of Kane County, except the Townships of Aurora, Sugar Grove, Big Rock, Batavia, and Geneva.

District No. 14 shall be comprised of all of DuPage County, except Census Tracts 8401, 8402, and 7701 in Addison Township.

District No. 15 shall be comprised of all of the Counties of Ford, Livingston, LaSalle, Grundy, Kendall, DeKalb, Woodford, Marshall, and Putnam; and all of the Townships of Aurora, Sugar Grove, Big Rock, Batavia, and Geneva in Kane County.

District No. 16 shall be comprised of all of the Counties of Boone, Winnebago, Stephenson, Ogle, and Jo Daviess; and all of Lee County, except the Townships of Palmyra, Nelson, South Dixon, Harmon, Marion, Hamilton, and East Grove; and all of McHenry County, except the Townships of Marengo, Riley, Coral, Dorr, Grafton, Nunda, and Algonquin.

District No. 17 shall be comprised of all of the Counties of Will, Kankakee, and Iroquois; and all of Bloom Township, except the Villages of Homewood and Flossmoor in Cook County.

District No. 18 shall be comprised of all of the Counties of Stark, Peoria, Knox, Mason, Tazewell, Cass, Schuyler, and Brown; and all of Bureau County, except the Townships of Fairfield, Greenville, Gold, and Manilus.

District No. 19 shall be comprised of all of the Counties of Hancock, McDonough, Henderson, Warren, Mercer, Rock Island, Fulton, Henry, Whiteside, and Carroll; and all of the Townships of Fairfield, Greenville, Gold, and Manilus in Bureau County; and all of the Townships of Palmyra, Nelson, South Dixon, Harmon, Marion, Hamilton, East Grove in Lee County; and all of the Townships of Lima, Mendon, and Ursa in Adams County.

District No. 20 shall be comprised of all of the Counties of Macoupin, Jersey, Calhoun, Greene, Pike, Scott, Morgan, and Sangamon; and all of Adams County, except the Townships of Lima, Mendon, and Ursa; and all of Madison County, except the Townships of Wood River, Fort Russell, Chouteau, Edwardsville, Granite City, Venice, Nameoki, Collinsville, Jarvis, St. Jacob, and Helvetia; and all of Montgomery County, except the Townships of Audubon, Nokomis, Witt, Filmore, South Filmore, East Ford, Grisham and Hillsboro.

District No. 21 shall be comprised of all of the Counties of Champaign, Piatt, McLean, DeWitt, Logan, and Menard; and all of Macon County, except the Townships of Mount Zion, and Milan.

District No. 22 shall be comprised of all of the Counties of Vermillion, Edgar, Clark, Douglas, Moultrie, Christian, Shelby, Coles, Cumberland, Effingham, Jasper, Crawford, Clay, Richland, Lawrence, Fayette, Wayne, Edwards, and Wabash; and all of the Townships of Mount Zion, and Milan in Macon County, and all of the Townships of Audubon, Nokomis, Witt, Filmore, South Filmore, East Fork, Grisham, and Hillsboro in Montgomery County.

District No. 23 shall be comprised of all of St. Clair County; and all of the Townships of Wood River, Fort Russell, Chouteau, Edwardsville, Granite City, Venice, Nameoki, Collinsville, Jarvis, St. Jacob, and Helvetia in Madison County.

District No. 24 shall be comprised of all of the Counties of Alexander, Pulaski, Massac, Union, Johnson, Pope, Hardin, Jackson, Williamson, Saline, Gallatin, Randolph, Perry, Franklin, Hamilton, White, Jefferson, Washington, Monroe, Marion, Clinton, and Bond.

The terms "census tract", "enumeration district" and "block group" used herein are those terms as defined by the 1970 Population Census.

APPENDIX 3
PART 1

MAP OF TWELVE DOWN-
STATE CONGRESSIONAL
DISTRICTS

[A4507]

CHICAGO CITY

MAP OF "CHICAGO" CONGRESSIONAL
DISTRICTS

[A4509]

CAMPBELL, Senior District Judge (dissenting):

The first of this series of related cases concerning the apportionment of the Congressional districts of Illinois, Kirby v. Illinois State Electoral Board, 65–C–75, was filed in this court in January of 1965. That case challenged the Congressional districts which were enacted by the Illinois legislature pursuant to statute and purportedly on the basis of population (Illinois Rev.Stat., Ch. 46 § 156 f.1) in its 1961 session. The districts so drawn were not substantially equal in population and as such were constitutionally invalid. Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964). The Kirby case and a later filed case, Kusek v. Kerner, 65–C–81, were consolidated before me as the judge to whom the lower numbered case had been assigned by lot. (See local Rule 10 of this district). Shortly after the case was assigned to me, I determined that this was a matter which must be heard by a three judge court pursuant to 28 U.S.C. § 2284. Subsequently and pursuant to § 2284 Chief Circuit Judge Castle and District Judge Decker were designated to complete the three judge panel.

Similar litigation was pending at that time in the Supreme Court of Illinois, see People ex rel. Scott v. Kerner, 32 Ill.2d 539, 208 N.E.2d 561 (1965). By order of the Supreme Court of Illinois and of this court the two political factions which make up the State Electoral Board were granted an opportunity to settle this controversy in an orderly fashion in pre-trial conference in this court. Accordingly and pursuant to that order and with the approval of the Illinois Supreme Court and Judges Castle and Decker, I conducted lengthy Rule 16 (F.R.Civ. P.) conferences with counsel for both parties and subsequently reached an agreement on districts which fully complied with the then Supreme Court standards in terms of "one man-one vote." See Kirby v. Illinois State Electoral Board, 251 F.Supp. 908, N.D.Ill. Again with the approval of the Illinois Supreme Court simultaneous decrees were entered and promulgated as the redistricting plan for the Illinois Congressional districts. See Kirby and People ex rel. Scott, supra.

In fashioning the relief in that case we stressed in our opinion, as did the Illinois Supreme Court in its opinion, that all of the districts originally established by the legislature, including those admittedly malapportioned, constituted a nucleus around which constitutional congressional districts can be and were constructed without drastic change. As stated in my opinion: "I have furthermore with the approval of the Illinois Supreme Court, after studying the maps of the parties and considering the areas of divergence, prepared a congressional reapportionment plan utilizing the nucleus of each existing congressional district and enlarging or decreasing it to comply with the one man one vote principle." 251 F.Supp. at 910.

In its simultaneous decree, the Illinois Supreme Court also stressed the same considerations:

> We believe the provisional plan so adopted to be just, equitable and constitutionally valid. As stated in the Federal district court's pretrial memorandum, this plan utilizes the nucleus of each existing congressional district, * * * enlarging or decreasing it to comply with the 'one man, one vote' principle, thereby according the greatest possible effect to the 1961 legislatively devised apportionment plan which should heretofore govern congressional representative elections." (33 Ill.2d at 462, 211 N.E.2d at 737).

The Illinois Supreme Court added that it considered our resolution of this problem an accomplishment it deemed "conducive to the best interests of the people of this State."

Both courts also stressed that, "Since apportionment problems are pre-eminently legislative responsibilities, the plan described in this opinion is required only by legislative nonfeasance and is therefore provisional in nature."

The provisional judicial plan was thus put into effect and governed the con-

gressional elections of 1966 and 1968, due to continued legislative nonfeasance.

In 1969, in the wake of two decisions of the United States Supreme Court, Kirkpatrick v. Preisler, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969), and Wells v. Rockefeller, 394 U.S. 542, 89 S. Ct. 1234, 22 L.Ed.2d 535 (1969), plaintiffs filed this latest case alleging that the provisional judicially drawn districts of 1965 exceeded constitutional standards promulgated in those new cases. In *Kirkpatrick* deviations of only 3.13 percent above and 2.83 percent below the average were held invalid. In *Wells* the court rejected deviations ranging from 6.6 percent above to 6.8 percent below the average. The provisional judicially drawn map of Illinois contained deviations as high as 7.5 percent above the average and 6.1 percent below. Because the allegations of plaintiffs' complaint brought into question the validity of our continuing provisional decree entered mutually with the Supreme Court of Illinois, the cause was assigned to my calendar and to this panal as being related to the original *Kirby* case.

Upon a hearing we concluded that the relief we fashioned in our provisional plan in the light of recent and subsequent Supreme Court cases did not go far enough in the adjustments that we had made in the original legislative districts. We therefore concluded that the provisional plan was itself not constitutional, and that further modifications were necessary. 307 F.Supp. 698. We further concluded that because the 1960 census figures were no longer reliable, the most appropriate relief would be to permit the election of 1970 to proceed under the provisional plan still in effect and await the computation of reliable and accurate census figures which would be available after the 1970 census. In our order we specifically stated we assumed that the General Assembly of Illinois would at long last do its duty and enact a valid plan for the districting of Illinois Con-

gressional districts based on the 1970 census. If it failed so to do we specifically stated that, "this court shall undertake approprate relief", obviously thus anticipating possible further adjustments in the 1961 legislative plan.

When viewed against this background it is clear to me that the jurisdiction of this panel under our general retention order was and is limited to making our provisional plan constitutional under changing Supreme Court decisions and population census changes until the Illinois legislature exercises its primary constitutional function of drawing new districts for the election of members to the United States House of Representatives. We have, in my judgment, no authority at this stage of these seven year old "provisional" proceedings to usurp the legislative function and draw entirely new districts to favor one geographical segment of the state, to reduce minority representation, to gerrymander politically to the benefit of one party or for any other reason.

When the legislature failed in its duty to redistrict during the 1971 session we invited all parties, and all those who sought to become parties, to file with the court any proposal they might have to validate our provisional plan until the legislature should finally act. In response to that order four plans were timely filed; one by the plaintiff; one by the Illinois Congressional Delegation; one by the Republican Leadership of the Illinois House of Representatives;[1] and a fourth by one Aram Hartunian, a private citizen and attorney who sought leave to intervene. The Illinois Democratic State Central Committee and Democratic Central Committee of Cook County ("Democratic Party") also filed a plan in support of their argument at the hearing.

A hearing was held, evidence submitted and arguments heard as to the merits or lack thereof in each of the plans submitted. Upon said evidence as submitted and pursuant to Rule 52, F.R.C.P., I make

---

1. This plan was submitted by W. Robert Blair, Speaker of the House, Henry J. Hyde, Majority Leader of the House, and Edward R. Madigan, Chairman of the House Reapportionment Committee.

the following Findings of Fact and Conclusions of Law.

The teachings of Kirkpatrick v. Preisler and Wells v. Rockefeller, *supra*, require mathematical exactness in the drawing of congressional districts, and any variance, however so slight, must be justified. In light of those teachings it is apparent that in any apportionment case where there are alternatives before a court the court must approve the plan which appears to be the most perfect in terms of population or find specific facts as to why the most perfect plan was rejected in favor of another proposal. This proposition is illustrated in a recent decision of Chief Justice Warren Burger denying a stay order in a school segregation case, Board of Education v. Scott, No. 71–274, Oct. Term 1971, decided August 31, 1971. In that case, the Chief Justice cites and quotes a prior decision in the case rendered by the Court of Appeals for the Fourth Circuit: "If the district court approves a plan achieving less actual desegregation than would be achieved under an alternate proposed plan, it should find facts that are thought to make impracticable the achieving of the greater degree of integration."

In this case it is stipulated by all parties and I now so find that the most perfect plan before this court in terms of mathematical exactness is that submitted by the Democratic Party in its argument before us. Accordingly under the teachings of *Kirkpatrick* and *Wells*, *supra*, we are bound to accept that plan or find facts which indicate that the acceptance of that plan is impracticable or that the acceptance of another is for some reason justified.

In my consideration of the plan submitted by the Democratic Party I find that partisan inspired plan unacceptable as it goes well beyond the limited provisional relief anticipated in our prior decrees and orders, and presents an entirely new plan both in theory and in practical result.

I find the plans submitted by plaintiff Skolnick, Mr. Hartunian and by the Republican leadership (generally referred to as the "Blair" plan) unacceptable for the same reasons. I further find and conclude that the only map presented to the court which complies or even attempts to comply with our limited power to alter the provisional decree is that expertly drawn plan submitted by the Illinois Congressional delegation. That plan is supported by all incumbent Congressmen from Illinois (12 Republicans and 12 Democrats). In terms of mathematical equality between districts, it is clearly superior to the maps of the plaintiff, of Hartunian and of the Republican leaders of the House which follow in that order. Most importantly, however, the Congressional delegation has in a statesmanlike fashion submitted a plan which totally utilizes the nucleus of each existing congressional district and enlarges or decreases a district only in so far as it is necessary to do so to comply with our directive of mathematical exactness. In this regard it causes the least drastic changes in the provisional plan heretofore promulgated by this court and the Illinois Supreme Court and accomplishes exactly what in my judgment this panel has the limited jurisdiction to do.

In adopting the Congressional Delegations' proposal as the only valid plan before the court, I conclude that a court, no less than a legislature, should, where possible, avoid doing "unnecessary violence to the heart of existing districts". Maryland Citizens Committee for Fair Congressional Redistricting v. Tawes, 253 F.Supp. 731 (M.D.Md.1966). For continuity in government is a valid consideration in legislative redistricting. See Skolnick v. City Council, 319 F.Supp. 1219 (N.D.Ill.1970).

I am gratified that James P. Chapman, Esq., who is Executive Director of the Independent Precinct Organization, an active force in independent politics, and who was appointed by the Chicago Bar Association to act on its behalf as *Amicus Curiae* and as counsel for the class, i. e. the voters of Illinois, appears to agree with my analysis of the various proposals.

Mr. Chapman,[2] speaking only as our appointed Amicus Curiae summarized for us at our hearing the various proposals.

As to the proposal of the Congressional Delegation, Mr. Chapman in substance stated that this proposal has merit in that it grows on something the Courts have approved in the past and something originally approved in the process of political give and take, i. e., the 1961 statute.

The adoption of the Congressional Delegation's plan will also preserve the harmony and good relations this Court has enjoyed with the Courts of Illinois. The history of judicial reapportionment in Illinois thus far records close cooperation between this court and the Illinois Supreme Court thus avoiding any disruption of state-federal relations in this ultra sensitive subject. The mutual involvement of the Illinois Supreme Court and this Court in the subject of reapportionment is discussed in detail by Professor Robert G. Dixon, "Democratic Representation-Reapportionment in Law and Politics," (Oxford University Press 1968). Stated briefly, in 1965 cases involving the apportionment of the Illinois State Senate were filed in both the Illinois Supreme Court and this Court. See People ex. rel. Engle v. Kerner, 32 Ill.2d 212, 203 N.E.2d 33 (1965), and Germano v. Kerner, 241 F.Supp. 715 (N.D.Ill. 1965). Because of the potential controversy between this Court and the Supreme Court of Illinois, the Supreme Court of the United States wisely directed our Court to defer to the Illinois Supreme Court in our reapportionment efforts. After extensive Rule 16 (F.R. C.P.) conferences were held by me, agreement was reached on the Illinois Senate Reapportionment and the map in that case was jointly promulgated by this Court and the Illinois Supreme Court. These Congressional redistricting cases immediately followed and, as above stated, agreement was again accomplished on the same basis. See Kirby v. State of Illinois Electoral Board, and People ex rel.

Scott v. Kerner, *supra*. I think it quite apparent from reading our decision in *Kirby* and the decision of the Supreme Court in *People ex rel. Scott* that this harmony was preserved only by our adoption of a plan which was provisional in nature and which utilized the nucleus of existing districts based on the last valid legislative plan. I conclude that any drastic deviation from the provisional plan approved by the Illinois Supreme Court breaks faith with that Court and is totally inconsistent with the directive of the United States Supreme Court to defer to the Illinois Court in these reapportionment issues.

My distinguished brothers constituting the majority of this panel approve entirely, without any changes even to accomplish the mathematical perfection of the other plans before us, and as a new provisional plan, the proposal submitted by the Republican leadership of the Illinois House of Representatives referred to as the Blair Plan. I regret that I must at this point part company with them in this case.

The Blair Plan I find is a purely partisan effort by the Republican leadership in the Illinois House. I further find its only distinction to be the extent to which it achieves the utmost in political gerrymandering. It is not mathematically the best plan. It has no relationship whatsoever to the plan adopted by this court jointly with the Supreme Court of Illinois as a provisional plan in 1965. It completely abandons the "nucleus of existing congressional districts" and thereby gives no effect, "to the 1961 legislatively devised apportionment plan."

The Blair Plan is all but identical to the proposal introduced into but not passed by the Illinois Legislature. (H.B. 2907, 77th General Assembly). The bill did pass the House of Representatives in the last hours of the last session, but only as a vehicle for negotiations in the Senate. Those negotiations of course failed and the bill did not pass the Senate.

---

2. Mr. Chapman stated that he could not speak for the Chicago Bar Association because of the impossibility due to limitations of time to seek approval of his position by the Association's Board of Managers.

Furthermore, the bill as passed also contained a complete plan for the reapportionment of Illinois Senate and House districts. Its passing the House is thus totally irrelevant. Indeed, the weakness of the majority opinion herein is demonstrated by its reliance on this thin reed.

We were told by their counsel that the Blair Plan is a desirable one because it "recognizes existing political boundaries," that is as many districts as possible are completely contained within the City of Chicago. Ironically in the rest of Cook County the plan completely disregards the territorial integrity of cities and villages. Instead, antiquated township lines are followed, which guarantees that municipalities will be divided. On cross examination, Representative Madigan, the chief architect of the Blair proposal, admitted that the City of Chicago was the only city whose boundaries were considered in the preparation of his proposal.

By Mr. Hartunian:

Q. You found it appropriate in drawing the map that you submitted to differentiate the City of Chicago's population from all the suburban population of Cook County. That is what your map does, isn't it?

A. Yes, sir.

Q. Is that because you find that it's advisable to keep cities as much as possible separate, separate from suburban areas, on the basis of community of interest?

A. It is an expression of a desire on my part to recognize the existing political boundaries wherever that can be done without causing population variances, and I believe that we have done that.

Q. In the 12th District and in the 10th District, for example, you used township lines, didn't you?

A. That's right.

Q. You are aware that township lines run *right through various municipalities*?

A. *Yes, sir.*

Q. Do you know whether or not the northern boundary of Maine Township runs right through the Village of Glenview?

A. No, I do not know that.

Q. Well, do you know whether or not the township boundaries of Maine Township run through several municipalities?

A. No, sir, I do not know that.

Q. Do you know that it's typical, at least in Cook County, for township lines to run right through municipalities?

A. Are you asking me if I know—

Q. If you know that.

A. (Continuing): —that that type of situation exists generally throughout Cook County?

Q. Yes.

A. *Yes*, I'm aware of that.

Q. So in using township lines, *you necessarily divide municipalities*?

A. That's correct.

On the basis of the evidence I find that the sole reason the geographic boundaries of Chicago are adhered to in the Blair proposal while all others are disregarded is that by containing as many districts as possible totally within the City of Chicago—where votes are predominantly Democratic—the number of seats that party can win in Congress is limited and the voices of the many minorities residing in Chicago are diluted.

Blair proponents also urge that the "suburbs" are entitled to more representation because population trends indicate a movement of population from the city into the suburbs. But any map approved on the basis of one-man one-vote will insure equal representation to every voter no matter where he lives.

Finally, the Blair proposal is said to be without any political motivation whatsoever. I find that suggestion to be completely dispelled in the following colloquy which occurred after Representative Madigan explained that in their proposal there was only one district (the 17th)

where he was sure there was no present incumbent congressman.

Q. Now, does the Speaker of the Illinois House presently reside in District 17?

A. In proposed District 17, yes.

Judge Campbell: That is Mr. Blair?

Mr. Reuben: Mr. Blair.

By Mr. Reuben:

Q. Old District 17 is Mr. Arends' district, is it not?

A. That's right.

Q. Present District 17. And he would be—under your proposal, he would be no longer—no longer reside in new District 17, correct?

Mr. Wexler: I object to that, because Representative Arends can change his address at any time.

Mr. Reuben: Assuming he doesn't.

Judge Castle: Overruled. He may answer.

By the Witness:

A. Assuming that Representative Arends continues to live in Melvin, he would live in proposed District 15.

By Mr. Reuben:

Q. Did the Speaker of the House name you as chairman of the reapportionment committee?

Mr. Wexler: Objection.

Judge Castle: Overruled.

By the Witness:

A. Yes.

Furthermore, I find that while counsel urging the Blair proposal vigorously attacks the Congressional delegation map as an attempt to protect incumbents, in the Blair proposal no incumbent Republican is threatened with loss of his seat in Congress. It seems that in the opinion of the Blair proponents protection of incumbents can be either vice or virtue depending upon the political affiliation of the incumbent.

In sum, the Blair proposal—which passed the Illinois House of Representatives only as a vehicle for negotiations which failed in the Senate—is but a poorly disguised attempt to segregate the voters of the City of Chicago from the rest of Cook County in an effort thereby to dilute the overall voting strength of the large Democratic majorities that reside within that City. It has the ancillary benefits of preserving the seats of all incumbent Republicans and assuring for the Speaker of the House a seat in Congress for him or his designate. In my judgment it has no other merits which lend itself to adoption by this court.

Again paraphrasing our *Amicus*, Mr. Chapman, the Blair proposal in its effort to separate the City of Chicago from the remainder of Cook County has an obvious devisive effect and is founded on political considerations not in the public interest.

I mean no criticism of the Republican leaders of the Illinois House for their preparation and presentation of their plan, both in the General Assembly and before this Court. On the contrary, I commend them for their partisan advocacy. I do take issue with my brothers on this Court however to the extent that they may adopt such partisan advocacy in their decree.

In my view, by adopting the Blair plan the majority completely disregards the sole function of our self extended and outworn jurisdiction in this case and becomes legislators in their own right. In his celebrated dissenting opinion in Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), the landmark case thrusting our courts into this political thicket of legislative reapportionment, Mr. Justice Frankfurter forewarned that the incursion by the judiciary into the traditional domain of the legislature would, "invite legislatures to play ducks and drakes with the judiciary." 369 U.S. at 268, 82 S.Ct. at 738. Justice Frankfurter's words have indeed proven prophetic.

In their drastic departure from the provisional plan the majority not only breaks faith with the Supreme Court of Illinois but in my view seriously misleads the parties to this litigation. This cause

came to this panel as a related case—related to the 1965 *Kirby* case, in which the provisional plan was promulgated by this panel and the Illinois Supreme Court. If such drastic relief had been thought possible, surely the parties would have insisted upon a new assignment which would have been their right under our local rule. (See local rule 10, General Rules Northern District of Illinois). Furthermore, by adopting a wholly new plan the majority also departs from the procedures which we have adopted in the prior related cases of sitting down in pretrial conference with all parties of interest in the hope of establishing an acceptable agreement.

I do not intend to infer that politics have no place in judicial reapportionment. Reapportionment is intrinsically political. But it is one thing to weigh political factors in arranging some districts in an effort to do justice to all and quite another to discard the rights of some in an effort to achieve partisan gerrymandering. I have expressed these views in prior cases; and the same are reported at length by Professor Dixon, "Democratic Representation-Reapportionment In Law and Politics" (Oxford University Press, 1968). In that book Professor Dixon writes:

> Chief Judge Campbell's central premise, building out really from Justice Felix Frankfurter's dissenting opinion in Baker v. Carr, seems to be this: Reapportionment is generically a political matter; but having made the crucial decision to enter the political thicket, judges must act as statesmen-politicians, within the safeguards of bi-partisan pre-trial conference, in order to do an honest job of reapportionment. At the press conference a reporter noted there had been some comments that Judge Campbell had considered political factors in arranging some districts. The Judge's response was forthright and clear:
>
> > I certainly did; it's a necessary part of trying to work out a fair and balanced set of districts from the standpoint of the interests of each

political party. But there is crucial difference between considering political factors in an attempt to do justice to each party in regard to provision of safe and swing districts, and a one-sided partisan political gerrymander for the advantage of one party alone.

I conclude that the plan submitted by the equally bi-partisan Illinois Congressional Delegation should be adopted by this court as a fair, just, equitable and mathematically accurate up-dating of our provisional plan to conform to the 1970 census and the one man one vote constitutional principle.

To the extent that the foregoing Findings of Fact, Conclusions of Law and Memorandum disagree with those to be filed by my brethren of this panel, I dissent.

### ORDER

DECKER, District Judge.

This Court having considered the motions of Plaintiff, Sherman H. Skolnick and Intervenor W. Robert Blair which seek injunctive relief in this matter against the Supreme Court of Illinois and the motion of Defendant, State Electoral Board of Illinois, which seeks injunctive relief against the various parties to an action now pending before the Illinois Supreme Court, each of said motions having invoked Title 28 U.S.C. §§ 2283 and 1651, and the Court having conducted a hearing and heard the argument of counsel for parties;

This Court finds, that on September 21, 1971 the three-judge panel of Judges Castle, Campbell and Decker entered its final order in the matter of Skolnick v. State Electoral Board of Illinois, 69 C 755, adopting a Congressional redistricting plan and ordering the defendant, the State Electoral Board of Illinois to comply with the apportionment plan so adopted, said order having been entered after a full hearing during which evidence was heard and all interested persons or parties were given the opportunity to be

heard or testify, and from which order no appeal has been taken;

On or about October 5, 1971 a "Motion for Leave to File Petition for Supplementary Relief in the Matter of Apportionment of Illinois Congressional Districts and for the Substitution and Addition of Parties or, in the Alternative, Original Petition for Writ of Mandamus" was filed with the Clerk of the Illinois Supreme Court by Petitioners Joseph Germano, John Alesia, Joseph Cesario, Sam E. Perish and Buddy W. Davis against Respondent members of the State Electoral Board of Illinois: Richard B. Ogilvie, Governor; William J. Scott, Attorney General; Alan J. Dixon, Treasurer; Michael J. Howlett, Auditor; James A. Ronan, Chairman, Democratic State Central Committee and Victor L. Smith, Chairman, Republican State Central Committee, which Petition or Motions seek to modify, supersede, set aside or nullify the September 21, 1971 order of this Court and to order Defendant State Electoral Board not to comply with said order of this Court.

On or about October 14, 1971, the Supreme Court of Illinois allowed the above-named Petitioners leave to file an original petition for mandamus under No. 44728, but did not grant Petitioners leave to file a petition for supplementary relief in case No. 39201 (reported as Scott v. Kerner, 32 Ill.2d 539, 208 N.E.2d 561 (1965). Said order of the Illinois Supreme Court directed the Respondents to file their answer to the Petition on or before October 26, 1971, whereupon Petitioners could file their reply on or before November 5, 1971, with oral argument to be heard in Springfield on November 9, 1971.

On or about October 14, 1971, Edward V. Hanrahan, State's Attorney of Cook County on behalf of himself and Edward J. Barrett, County Clerk filed a "Motion for Leave to File an Original Petition for Writ of Mandamus and Supporting Suggestions" with the Clerk of the Supreme Court of Illinois, which Petition asked that the Illinois Supreme Court direct the Defendant Electoral Board not to conduct an election pursuant to this Court's order entered September 21, 1971 and that the Secretary of State be directed to advise any interested persons that, among other things, the districts established by this Court are unconstitutional.

On October 26, 1971, pursuant to the order of the Illinois Supreme Court, the members of the State Electoral Board filed their "Answer and Suggestions" with the Illinois Supreme Court, setting out, among other things, that a Petition for Original Mandamus was without authority in that the Petition sought a declaratory judgment as to this Court's order and that declaratory judgment was not a method of relief subject to the original jurisdiction of the Supreme Court of Illinois. The "Answer" further pointed out that the Petition was filed after the entry of our order and would be determined only one month from when candidates nominating petitions were to be filed. Said "Answer" also makes the observation that the new Constitution of Illinois is totally silent as to Congressional districts or redistricting, contrary to the allegations of Petitioners that new Illinois standards governing Congressional districting had been established by said Constitution of 1970.

On October 27, 1971, the Clerk of the Supreme Court of Illinois issued a letter to the Honorable Edward V. Hanrahan informing him that the Supreme Court of Illinois had denied his petition for an original writ of mandamus; however, leave was given for Mr. Hanrahan to appear as amicus curiae in Case No. 44728 filed by Petitioner Joseph Germano, et al.

In addition to the parties and movants herein or their attorneys, Edward V. Hanrahan and Joseph Germano, et al., were represented by their counsel and heard by this Court and John E. Cassidy, though not a party or intervenor to this matter, was allowed to argue to this court with regard to the three motions heard by this court.

This Court finds that the matter of Congressional redistricting is one

of general public importance and that the motions filed herein raise issues of vital importance to the People of Illinois and to the many persons who may desire to seek election to the House of Representatives of the United States Congress from Illinois and the supporters of such candidates. Some, though not all, of the issues considered by this Court were:

1. Whether this Court should further stay its consideration of what districts should govern the Illinois seats for United States Representatives and await action by the Illinois General Assembly in the hope it would act in timely fashion to coincide with the December 13 to 20 filing dates for nominating petitions;

2. What the power of the Illinois Supreme Court would be to override, directly or indirectly, the order of this United States District Court after this Court had afforded virtually every opportunity possible to the Illinois General Assembly to create new and Constitutional Congressional districts by awaiting such remedial action from the entry of our order December 21, 1969 declaring the 1965 districts unconstitutional through today;

3. What weight should be given to the contentions of some that there is still time for the legislature to act or for the Supreme Court of Illinois to create a different map from the one we approved or whether we should take notice of the legislature's long history of inaction on this subject and the in-court admission by a member of the Illinois House of Representatives that redistricting by our legislature in the near future was unlikely.

4. Whether, absent any indication of belated legislative efforts, the Supreme Court of Illinois should seek to interfere with the carrying out of the United States District Court order entered two weeks before the filing of Germano v. Lewis, No. 44728.

5. When injunctive relief pursuant to 28 U.S.C. §§ 2283 and 1651 is permitted and whether under the present circumstances injunctive relief is essential to prevent grave and irreparable damage to the electorate of Illinois and the candidates and their supporters.

6. Whether injunctive relief pursuant to 28 U.S.C. §§ 2283 and 1651 would be timely and wise in the interest of comity, to avoid unseemly conflict and to uphold the dignity of the United States District Court or whether any other useful remedy than injunction would serve the purpose.

This Court further finds that the parties, petitioners, respondents and amicus curiae in the matter of Germano et al. v. Lewis et al., No. 44728, in the Supreme Court of Illinois, are entitled to a full hearing before any final resolution of these important and difficult issues, but it is equally important that the status quo be maintained pending such final resolution.

It is hereby ordered, therefore, that all parties and the amicus curiae in the matter entitled People ex rel. Joseph Germano v. John W. Lewis, No. 44728 in the Supreme Court of Illinois, specifically Joseph Germano, John Alesia, Joseph Cesario, Sam E. Perish and Buddy W. Davis, petitioners, Edward V. Hanrahan, amicus curiae, John W. Lewis, Secretary of State, Richard B. Ogilvie, Governor, William J. Scott, Attorney General, Alan J. Dixon, Treasurer, Michael J. Howlett, Auditor, James A. Ronan, Chairman, Democratic State Central Committee and Victor L. Smith, Chairman, Republican State Central Committee, respondents and members of the State Electoral Board of Illinois, and all other persons having knowledge of this Court's order herein be and are hereby temporarily restrained from further proceeding in the above-entitled action now before the Illinois Supreme Court or from filing any new actions affecting the matters herein in issue pending the further hearing and final disposition of this motion.

It is further ordered that Petitioners Joseph Germano, John Alesia, Joseph Cesario, Sam E. Perish and Buddy W. Davis and Edward V. Hanrahan, amicus curiae in the Illinois Supreme Court mat-

ter, be and are hereby given leave to file with this court, their responses to the motion of the State Electoral Board of Illinois on or before November 9, 1971 and that the application of said Defendant State Electoral Board of Illinois for preliminary and permanent injunctive relief are hereby consolidated for hearing by this Court and the matter of any such injunctive relief is set for argument before this Court on November 11, 1971 at 2:00 p. m.

With respect to the motions of Plaintiff Sherman H. Skolnick and W. Robert Blair, et al., this Court finds that in view of the foregoing action of this Court and the present posture of the matter now before the Illinois Supreme Court, there is no necessity at this time for this Court to consider these other requests for injunctive relief and it is therefore ordered that said two motions be and are hereby continued until taken up by this Court upon proper notice to all interested parties.

CAMPBELL, Senior District Judge, objects to the entry of this Order and will file his suggestions in support of his objections within five (5) days from the date of this Order.

CAMPBELL, Senior District Judge (dissenting):

I must respectfully and vigorously dissent from the unprecedented and unwarranted action of the majority of this panel in granting the motion of the Illinois Electoral Board and thereby restraining the parties to the litigation presently pending before the Illinois Supreme Court in the case of People ex rel. Germano, et al. v. John W. Lewis, et al., (No. 44728). In my view, this action by my brothers of this panel is legally and factually unfounded and seriously threatens to disrupt the delicate and sensitive balance between our federal and state courts.

As I indicated in my dissent to the majority opinion filed in this cause on September 21st, 1971, this is but one of a series of cases relating to the apportionment of Illinois Congressional Districts. The Districts in use prior to the commencement of this law suit in 1969 were formulated and adopted in December of 1965 by the joint action and decrees of this court and the Supreme Court of Illinois. See Kirby v. Illinois State Electoral Board, D.C., 251 F.Supp. 908 (1965) and People ex rel. Scott v. Kerner, 33 Ill.2d 460, 211 N.E.2d 736 (1965). Following the United States Supreme Court's decisions in Kirkpatrick v. Preisler, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969), and Wells v. Rockefeller, 394 U.S. 542, 89 S.Ct. 1234, 22 L.Ed.2d 535 (1969), plaintiffs herein filed this latest case seeking to set aside the then existing apportionment plan for Illinois Congressional Districts. Because the complaint questioned the validity of our continuing provisional decree entered mutually with the Supreme Court of Illinois, this cause was assigned to my calendar and to this panel as being related to the original *Kirby* case. We concluded that the provisional plan did not satisfy the constitutional requirements as enunciated in *Kirkpatrick* and *Wells*, but because the 1960 census figures could no longer be considered reliable, we determined that the most appropriate relief would be to permit the 1970 Congressional elections to proceed under the provisional plan and to await the compilation of the 1970 census figures before fashioning any additional relief that might be necessary. Since under the Constitution the primary responsibility for reapportionment falls to the State Legislature we indicated in our order that we assumed the General Assembly of Illinois would enact a valid Congressional districting plan based on the 1970 census. In the event that the Legislature failed to act, we retained jurisdiction so that we might "undertake appropriate relief." (Skolnick v. State Electoral Board, D.C., 307 F.Supp. 698 (1969).

Against this background it was my view, as expressed in my previous dissenting opinion, that our jurisdiction was limited in these cases to "constitutionaliz-

ing" our 1965 provisional plan until the Illinois Legislature exercised its primary constitutional function regarding Congressional reapportionment. At this stage of the seven year old "provisional" proceedings we had in my opinion no authority to draw entirely new districts thereby preempting the legislative function; to alter or tamper with minority representation; or to gerrymander politically for the benefit of either political party. The majority of this panel disagreed, however, and adopted what is called the "Blair Plan", so designated after its principal proponent, Republican House Speaker W. Robert Blair. As I previously stated, the only noteworthy characteristic of this plan is its partisan political accomplishment.

Notwithstanding our restricted jurisdiction in these remap cases, the majority of this panel ordered that the Blair Plan "govern the nomination and election of members of the House of Representatives of the United States Congress beginning with the 1972 primary and election and continuing thereafter until Illinois Congressional Districts are reapportioned *in accordance with law*." [Emphasis supplied]. Thus, even the majority recognized the provisional nature of our decrees in these cases.

Subsequent to the entry of this court's order in this cause on September 20, 1970, Joseph Germano and several other citizens and electors of the State of Illinois filed in the Supreme Court of Illinois a motion for leave to file an original petition for writ of mandamus. This action was commenced against the individual members of the State Electoral Board of Illinois in their capacity as members of that Board. The petition for writ of mandamus alleges that certain important questions of State law relating to Congressional apportionment were not passed upon by this court's opinion of September 20, 1971 in Skolnick v. State Electoral Board of Illinois, and requests the Illinois Supreme Court to consider and resolve those questions of state law. On October 14, 1971 the Supreme Court

of Illinois granted leave to file the original petition for writ of mandamus, directed the respondents to file their answer to the petition on or before October 26, 1971 and scheduled arguments in the cause for November 9, 1971.

Following the entry of the Illinois Supreme Court's order the State Electoral Board, by the Attorney General of the State of Illinois, moved this court for a temporary restraining order, temporary injunction and permanent injunction to restrain and enjoin each party to any action pending in the Illinois Supreme Court related to or affecting this court's order of September 20, 1971, and to restrain and enjoin all said persons from further litigating actions pending before the Illinois Supreme Court.

In seeking to enjoin the proceedings pending in the Illinois Supreme Court the Electoral Board relies on the exceptions contained in the Anti-Injunction Act. The statute (28 U.S.C. § 2283) provides:

"Stay of State Court Proceedings:

"A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."

The contention made by the Attorney General of Illinois on behalf of the Electoral Board is that the injunction is necessary here to aid this Court's jurisdiction and to protect and effectuate this court's judgment order of September 20, 1971.

To better understand the bitter political nature of this controversy and its impact on the delicate fabric of state-federal relations, it is significant to observe that the position advanced here by the Attorney General of Illinois is directly contrary to the stance taken by him before the United States Supreme Court in Scott v. Germano, 381 U.S. 407, 85 S.Ct. 1525, 14 L.Ed.2d 477 (1965), when he was Treasurer of the State of Illinois and a member of the State Electoral Board. There litigation was pending in

both State and Federal Courts regarding the reapportionment of the Illinois State House and Senate Districts. The Illinois Supreme Court in People ex rel. Engle v. Kerner, 32 Ill.2d 212, 205 N.E.2d 33, had deferred to the General Assembly of Illinois in order that it might perform its constitutional function of apportioning the State's legislative districts. The State Treasurer then asked this federal court to stay further proceedings in light of the Illinois Supreme Court's opinion in *People ex rel. Engle.* We refused to do so, noting that the litigation before us had been commenced previous to any litigation in the State Court. On appeal to the United States Supreme Court, the State Treasurer, who today as Attorney General asks this court to enjoin similar state court proceedings, argued in his brief that the fact that this federal court's jurisdiction had been invoked prior to the commencement of a related state court proceeding was not in and of itself controlling. It was further argued by the State Treasurer that the clear import of the United States Supreme Court's prior decisions was that the federal system should not impose its reapportionment remedies upon a state until that state has exhausted all of the reapportionment processes and remedies available to it according to its law. The Supreme Court agreed and ordered our court to stay our hand, noting that "the power of the judiciary of a State to require valid reapportionment or to formulate a valid redistricting plan has not only been recognized by this Court but appropriate action by the States in such cases has been specifically encouraged." Scott v. Germano, 381 U.S. 407, 409, 85 S.Ct. 1525, 1527 (1965). Unmistakably clear in the Supreme Court's opinion, too, is that appropriate action by the state includes action by the State Supreme Court. On the authority of Scott v. Germano alone, the temporary restraining order sought in this case should be denied. There are other persuasive reasons for denial of the relief sought here.

The excellent opinion of Mr. Justice Black in Atlantic Coastline Railroad v. Brotherhood of Locomotive Engineers, 398 U.S. 281, 285–287, 90 S.Ct. 1739, 26 L.Ed.2d 234 (1970), contains a concise yet very thorough history of the Anti-Injunction Act and the exceptions contained therein and relied on here. In that opinion Justice Black relates that when this nation was formed under its Constitution each state retained all of its sovereign powers not expressly delegated to the federal government. Among those powers not surrendered was the maintenance of state judicial systems for the resolution of legal controversies. Indeed there were those amongst the framers of our Constitution who felt that it would be unnecessary to establish a federal judiciary. A compromise resulted in the creation of one Supreme Court and Congress was left with the authority to create other federal courts. Notwithstanding this, only the Supreme Court was authorized to review on direct appeal the decisions of state courts. Each sector of this dual judicial system was to proceed independent of each other with ultimate review in the United States Supreme Court. Necessarily, conflicts and friction developed within this dual system and it was in this context that the first Anti-Injunction Act was enacted in 1789. As to Section 2283 as it presently appears the court stated: "moreover since the statutory prohibition against such injunctions in part rests on the fundamental constitutional independence of the States and their courts, the exception should not be enlarged by loose statutory construction. Proceedings in state courts should normally be allowed to continue unimpaired by intervention of the lower federal courts, with relief from error, if any, through the state appellate courts and ultimately this court." 398 U.S. 281, 287, 90 S.Ct. 1739, 1743 (1965).

The *Atlantic Coastline* case was initiated in a federal court where the railroad sought to enjoin the union from picketing a switching yard owned by the

railroad. The district court denied the request for injunction, holding that the union was free to engage in self help and that the Norris-LaGuardia Act and Section 20 of the Clayton Act precluded an injunction. The railroad then petitioned a state court and there obtained an injunction. No further action took place in the dispute until two years later, after the U. S. Supreme Court's decision in Brotherhood of Railroad Trainmen v. Jacksonville Terminal Company, 394 U.S. 369, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969). That case involved the validity of a state court injunction against picketing by the same union and other unions at a terminal located immediately adjacent to the shipping yard involved in the earlier federal district court case. The United States Supreme Court held that the union had a federally protected right to picket under the Railway Labor Act and that this right could not be interfered with by way of state court injunctions. Following the decision in *Jacksonville Terminal* the union requested the Florida State Court to dissolve its injunction in the shipping yard case, arguing that under *Jacksonville Terminal* the injunction was improper. The state court refused to dissolve its injunction and no appeal was taken from that decision. Rather the union went back to the federal district court and requested an injunction against the enforcement of the state court injunction. The federal district court entered the injunction and the United States Court of Appeals summarily affirmed. The Supreme Court reversed.

In the Supreme Court the union argued that the 1969 federal injunction was necessary in order to "protect or effectuate" the district court's denial of an injunction in 1967. It was contended that when the district court declined in 1967 to enjoin the picketing it had determined that the union had a federally protected right to picket the switching yard and that this right could not be interfered with by state courts. Thus, the argument continued, when the Florida state court enjoined the picketing the district court could, in order to

protect or effectuate its prior order, enjoin enforcement of the state court injunction.

After careful analysis of the issues involved in the federal district court proceedings, however, the Supreme Court concluded that the district court had then determined only that the general prohibition in the Norris-LaGuardia Act precluded a *federal* court injunction in labor disputes. [Emphasis supplied]. The question of whether federal law (i. e., the Railway Labor Act) prevented such injunctions by state courts, the Supreme Court ruled, had simply not been passed upon by the district court. Thus the issues in the 1967 federal court proceedings and the state court proceedings had not been the same. Therefore, the later injunction entered by the federal district court was not "necessary" in order to effectuate or protect its earlier order.

In setting aside the injunction granted by the district court, the Supreme Court stated: "First, a federal court does not have inherent power to ignore the limitations of § 2283 and to enjoin state court proceedings merely because those proceedings interfere with a protected federal right or invade an area preempted by federal law, even when the interference is unmistakably clear. This rule applies regardless of whether the federal court itself has jurisdiction over the controversy, or whether it is ousted from jurisdiction for the same reason that the state court is." The Supreme Court observed that both the state and federal courts had concurrent jurisdiction in the matter, and neither court was authorized to enjoin the parties from simultaneously pursuing claims in both courts.

The thrust of the Supreme Court's opinion in *Atlantic Coastline* acknowledged the grave and substantial questions which are presented in these cases arising under Section 2283. The court's closing admonition in *Atlantic Coastline* is pertinent here: "Any doubts as to the propriety of a federal injunction against state court proceedings should be resolved in favor of permitting the state

courts to proceed in an orderly fashion to finally determine the controversy. The explicit wording of § 2283 itself implies as much, and the fundamental principle of a dual system of courts leads inevitably to that conclusion." 398 U.S. 281, 297, 90 S.Ct. 1739, 1748.

The teachings of *Atlantic Coastline* clearly bar any injunction or temporary restraining order under the circumstances of this case. The original petition of writ of mandamus pending in the Illinois Supreme Court presents questions of state law not considered or passed upon by this court in its order and opinion of September 20, 1971. Whether the Constitution of the State of Illinois or principles of state law mandate that congressional districts be compact and contiguous as near as mechanically possible, or require that the "Core" or "Nucleus" principle be utilized in instances of judicial reapportionment, or dictate that communities of interest are relevant considerations in remap cases, and, if so, which communities predominate are all matters which properly lie within the jurisdiction of the Illinois Supreme Court. My reading of *Atlantic Coastline* leads me to conclude that any interference by this court with the consideration of those questions by the Illinois Supreme Court is prohibited by Section 2283. Indeed, Scott v. Germano, 381 U.S. 407, 85 S.Ct. 1525, 14 L.Ed.2d 477 (1965), vests the Illinois Supreme Court with a superior jurisdiction over these questions in the specific context of a reapportionment case. As to unsettled areas or unresolved questions of state law, this principle also received unequivocal recognition during the district court phase of the *Germano* case. There it was stated that "we reaffirm our intention not to impose ourselves upon Illinois court determinations of issues solely decidable on the basis of Illinois law." Germano v. Kerner, 241 F.Supp. 715, 722 (N.D.Ill.1965), reversed on other grounds, Scott v. Germano, 381 U.S. 407, 85 S.Ct. 1525, 14 L.Ed.2d 477 (1965).

Other reapportionment cases involving similar requests for federal stays of state court proceedings also convince me that no order or injunction would be proper in this case. In Moss v. Burkhart, 220 F.Supp. 149 (W.D.Okla.1963), the federal district court restrained certain parties from relitigating in the Oklahoma Supreme Court *federal constitutional questions* presented in the federal case. The district court, however, judiciously deferred to the Oklahoma Supreme Court on an issue of state law which had arisen during the controversy. The Oklahoma Supreme Court then assumed jurisdiction and decided the state law question which was presented to it but reserved its ruling as to the federal issue. Thereafter the district court treated as binding the decision of the Oklahoma Supreme Court on the state law question and restrained the parties only from attempting to litigate in state courts the federal questions which they previously had consented to have tried in the federal court.

Here, unlike Moss v. Burkhart, there is no attempt by Germano or any of the other parties to the proceeding pending in the Illinois Supreme Court to relitigate the federal constitutional questions ruled upon by this court's opinion of September 20, 1971. That opinion indicates clearly that all four reapportionment plans presented to us satisfy the requirements of the federal constitution. The propriety of this court's ruling as to that question is not even remotely presented in the mandamus proceeding pending in the Illinois Supreme Court. My examination of the original petition for writ of mandamus filed by the Germano petitioners in the Illinois Supreme Court and the cases cited therein makes this fact amply clear.

Persuasive additional support for my conclusion that the Anti-Injunction Act (§ 2283) precludes any injunction here is provided in the New York remap cases as well. WMCA, Inc. v. Lomenzo, 238 F. Supp. 916 (E.D.N.Y.1965) involved a federal constitutional challenge to the New York scheme of state legislative apportionment. State court proceedings concerning the same scheme of apportionment but raising only questions of state

constitutional law were also commenced. The three-judge panel sitting in *Lomenzo* was asked to enjoin the proceedings pending in the New York State Court. The motion noted that the state constitutional issues had also been presented to the district court. After observing that these claims raised difficult problems of state law interpretation, the district court invoked the abstention doctrine and declined to rule on the questions of state law. With respect to the request for an injunction against the proceedings in the New York courts the district court stated: "Since we are not passing on claims under the State Constitution, and since the proceedings begun in the state courts do not raise claims under the Federal Constitution, there is no possibility here of conflicting adjudications. Neither our jurisdiction nor our judgments are jeopardized, within the meaning of 28 U.S.C. 2283." That statement in *Lomenzo* represents a precise description of the situation presented here.

Moreover, the district court in *Lomenzo*, after adopting a plan which satisfied the requirements of the federal constitution, further acknowledged its respect for the province of state courts. It said: "Of course, the ultimate fitness of the scheme for their need and purposes is for the people of the State of New York, themselves, to decide, and not for this court to mandate." 238 F.Supp. 927. Justice Harlan, concurring in the United States Supreme Court's summary affirmance of WMCA, Inc. v. Lomenzo, 382 U.S. 4, 86 S.Ct. 90, 15 L.Ed.2d 15 (1965), asserted without reservation the principle that any final apportionment plan must comport with state as well as federal constitutional requirements. That this principle contemplates state court review is eminently clear for, as Justice Harlan said at a later stage in the New York cases, "This court has repeatedly encouraged the state courts to fashion appropriate relief in reapportionment cases, *even after a federal court has itself entered an order.*" Travia v. Lomenzo, 15 L.Ed.2d 46, 49 (in Chambers Opinion). [Emphasis supplied]. There is

still ample time for the Supreme Court of Illinois to act and we cannot interfere with its exercise of that opportunity.

There can be no doubt that the various states are free to apply their own notions of justice and fairness to the subject of apportionment, so long as those notions do not transgress the limitations of the federal constitution. The landmark decision of Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), reaffirmed the state's authority to formulate its own rules of apportionment. Specifically, the Supreme Court stated: "A State may legitimately desire to maintain the integrity of various political subdivisions, insofar as possible, and provide for compact districts of contiguous territory in designing a legislative apportionment scheme . . ., [so long as] the vote of any citizen is approximately equal in weight to that of any other citizen in the State." 377 U.S. at 578–579, 84 S.Ct. at 1390. The action of the majority in granting the motion for a temporary restraining order effectively prevents the citizens and electors of the State of Illinois from receiving a state court determination, specifically authorized and indeed encouraged by the United States Supreme Court, *of whether* the plan of apportionment adopted by this court's order of September 20, 1971 comports with the applicable principles of state constitutional law. It seems to me anomalous, if not outrageous, that this court could promulgate a map which might well be offensive to acknowledged principles of Illinois law and then bar by injunction every citizen of the State of Illinois from ever challenging its validity in the proper judicial forum.

If, as the Supreme Court stated in *Atlantic Coastline*, all doubts are to be resolved in these cases against interference with state court proceedings, surely this is a case where no injunction should issue. Moreover, even the most basic understanding of the language of Section 2283 and the reasons which prompted its enactment in Congress compel me to state candidly that I know of no clearer case than this against granting an injunc-

tion. Therefore, I hasten to add my dissent and I trust that the Illinois Supreme Court will not be intimidated in the performance of its constitutional responsibility by the wholly unjustified action of the majority of this panel.

## MEMORANDUM, FINDINGS OF FACT, CONCLUSIONS OF LAW AND INJUNCTION ORDER

CASTLE, Senior Circuit Judge, and DECKER, District Judge.

We are asked by the defendant, State Electoral Board of Illinois, under 28 U.S.C. § 1651 and § 2283 and pursuant to Rule 65 of the Federal Rules of Civil Procedure, to restrain and to enjoin the respondents, Joseph Germano, John Alesia, Joseph Cesario, Sam E. Perish and Buddy W. Davis, from proceeding further as petitioners in a recently filed and currently pending original mandamus proceeding in the Supreme Court of Illinois, entitled People ex rel. Germano, et al. v. Lewis, et al., Cause No. 44728. Similar injunctive relief is also sought against Edward V. Hanrahan, State's Attorney of Cook County, as amicus curiae in that proceeding, John W. Lewis, Secretary of State, Richard B. Ogilvie, Governor, William J. Scott, Attorney General, Alan J. Dixon, Treasurer, Michael J. Howlett, Auditor, James A. Ronan and Victor S. Smith, Chairmen, respectively, of the Democratic and Republican State Central Committees, as respondents in the aforesaid cause in the Supreme Court of Illinois and as members of the State Electoral Board of Illinois.

We entered a restraining order November 5, 1971, maintaining the status quo pending thorough consideration of the issues and to afford full opportunity to the parties and persons above-named to be heard by counsel on the consolidated requests for preliminary and permanent injunction. Having held such further hearing and having heard the arguments of counsel, we conclude that a permanent injunction should now be granted. Mindful of the important and sensitive federal-state relationships necessarily involved in our action, as well as the fundamental questions of judicial comity which must be resolved, we set forth herein the salient facts and legal principles which we deem controlling.

The history of the instant case, Skolnick v. State Electoral Board of Illinois, is fully set forth in our order entered September 21, 1971. It will be sufficient to summarize those developments which bear directly on the jurisdictional conflict which has arisen and which must be considered in determining the need for and the scope of the permanent injunction. Similarly, we consider briefly the remedy sought by the respondents to the pending motion in their role as petitioners in the original mandamus proceeding in the Supreme Court of Illinois, which, for convenience, we shall hereinafter refer to as Germano v. Lewis.

The instant case, Skolnick v. Electoral Board of Illinois, came to this court on April 9, 1969, and was assigned to the calendar of Judge Campbell. Shortly thereafter a three-judge court was convened pursuant to 28 U.S.C. § 2284. Pursuant to the teachings of Kirkpatrick v. Preisler, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969), and Wells v. Rockefeller, 394 U.S. 542, 89 S.Ct. 1234, 22 L.Ed.2d 535 (1969), we entered an order on December 31, 1969, holding that the existing congressional reapportionment approved by this court in 1965 in Kirby v. Illinois State Electoral Board, 251 F.Supp. 908 (N.D.Ill.1965), was no longer constitutional because of population disparities. We determined at that time that the 1970 congressional election might lawfully proceed under the 1965 plan, contemplating reapportionment of the congressional districts by action of the Illinois General Assembly in time for the 1972 election. In our order we provided:

"This court assumes that the General Assembly of Illinois will, during its legislative session in the first half of 1971, enact a complete and constitutionally valid plan of reapportionment

for election of Members to the United States House of Representatives from Illinois. Defendant is hereby ordered to present to this court on or before July 1, 1971 such duly enacted plan of reapportionment. Upon failure so to do this court shall undertake appropriate relief." 307 F.Supp. at 700.

In the subsequent regular session, which convened in January 1971 and adjourned on June 30, 1971, no new map was adopted by the General Assembly, and in consequence, following full hearing and the submission by the parties and intervenors of proposed maps, we then proceeded to draft a congressional reapportionment plan meeting applicable federal standards and which was set forth and ordered implemented in our order entered September 21, 1971. In so doing we followed the procedure indicated as appropriate in Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). See also, Roberts v. Babcock, 246 F.Supp. 396, 399 (D.Mont.1965), and Klahr v. Goddard, 250 F.Supp. 537 (D. Ariz.1966).

Subsequent thereto, the Illinois General Assembly convened in further session from October 5, 1971, to November 13, 1971, on which latter date, it adjourned until January 1972. Once again the Illinois legislature has failed to perform its duty to enact a constitutional and valid reapportionment plan. There appears no likelihood that it will do so in time for the 1972 congressional elections.

Similarly, no suit in any Illinois state court was filed during the pendency of the instant case prior to the entry of our order of September 21, 1971, which reapportioned the Illinois congressional districts, or which in any manner related to the issues before this court in Skolnick v. State Electoral Board of Illinois.

It is in this context of Illinois legislative and judicial non-action that we briefly review the nature and objectives of the original mandamus proceedings pending in the Supreme Court of Illinois.

On October 5, 1971, a motion was filed in the Supreme Court of Illinois by respondents herein Joseph Germano, et al., captioned a "Motion for Leave to File Petition for Supplementary Relief in the Matter of Apportionment of Illinois Congressional Districts and for Substitution and Addition of Parties, or, in the Alternative, Original Petition for Writ of Mandamus." The supplemental relief there sought represented an effort to reinstate and use, as a basis of continuing mandamus proceeding, the earlier case of People ex rel. Scott v. Kerner, 32 Ill.2d 539, 208 N.E.2d 561 (1965), in which the Illinois Supreme Court by simultaneous decree approved the redistricting plan adopted and also approved by this court in Kirby v. Illinois State Electoral Board, 251 F.Supp. 908, and reserved jurisdiction to assure the use of said plan in the 1966 congressional elections. The attempted exhumation failed. The supplemental relief was denied by the Illinois Supreme Court on October 14, 1971.

At the same time, however, the Illinois Supreme Court granted leave to Germano, et al., to file their petition for an original mandamus, Cause No. 44728, directing the named respondents therein to answer on or before October 26, 1971, and setting the matter for oral argument on November 9, 1971. Our restraining order intervened, and we are advised that no further proceedings have since occurred.

█ The petitioners in Germano v. Lewis (respondent herein) alleged *inter alia* that mandamus was "necessary to assure that the 1972 Illinois congressional elections take place only pursuant to a plan of congressional reapportionment reviewed and approved by this court. Only in this way can the citizens of Illinois be assured that such reapportionment will be consistent with applicable principles of Illinois law as well as federal constitutional requirements." The moving parties in Germano v. Lewis prayed:

"Wherefore, petitioners pray that a writ of mandamus issue forthwith against the respondent Lewis directing him to immediately take the following action: to advise all persons inquiring about Congressional nomi-

nating procedures of this proceeding and inform such persons that no nominating petitions should be circulated, except in Districts yet to be approved by this Court.

"Petitioners further pray that this Court retain jurisdiction of this cause for the purpose of taking such affirmative action as may be necessary to assure that the 1972 Illinois Congressional elections take place only pursuant to a districting plan approved by this Court."

This open and collateral attack upon our order of September 21, 1971, is claimed by respondents' counsel to be warranted by a "unique jurisdiction" in such cases as these, said to be conferred by Scott v. Germano, 381 U.S. 407, 85 S.Ct. 1525, 14 L.Ed.2d 477 (1965). It is further asserted that the Illinois Supreme Court should exercise this asserted overriding jurisdiction to assure that effect will be given to "new" Illinois standards said to have been established by the recently adopted Illinois Constitution of 1970. Our review of both Scott v. Germano, *supra,* and the new Illinois Constitution demonstrates the error of these contentions and confirms the need to protect our order of September 21, 1971, by appropriate injunction against the possibility of unfounded collateral attack.

Scott v. Germano, *supra,* vacated and remanded Germano v. Kerner, D.C., 241 F.Supp. 715 (1965), which had invalidated the Illinois State Senatorial reapportionment, consistent with the ruling of the Illinois Supreme Court in People ex rel. Engle v. Kerner, 32 Ill.2d 212, 205 N.E.2d 33 (1965). Despite the concurrent state ruling, this District Court refused to grant a motion to stay further action and to allow the state court an opportunity to fashion appropriate relief. The United States Supreme Court said that redistricting by the appropriate state agencies was to be encouraged, and ordered this court to stay its hearing so as to afford Illinois state agencies an opportunity to act. But even under these circumstances, the United States Supreme Court ordered that jurisdiction was to be retained by this court to fashion a "valid reapportionment plan, failing timely state action."

Unlike the instant case, in Scott v. Germano, *supra,* no valid reapportionment plan had come into existence by final order of either federal or state court. Unlike that case, here we have made every effort to afford opportunity to the Illinois General Assembly to adopt a constitutionally effective map over a period extending from December 1969 to September 21, 1971. To accept respondents' contention that there is an overriding and superseding jurisdiction in the Illinois Supreme Court under the facts of this case woud be effectively to nullify federal jurisdiction in reapportionment cases. We do not believe this was the intendment of Scott v. Germano, *supra.* In that case approximately nine months remained for appropriate redistricting. In the case at bar, after an interval of over twenty months, during which time state agencies were afforded an opportunity to act, the decision of this court issued on September 21, 1971. Nominating petitions are due December 13 to December 30, 1971, a matter of four to five weeks hence. It is now the eleventh hour.

Equally unconvincing are respondents' assertions that new Illinois standards, requiring application by the Illinois Supreme Court, have been established in consequence of the recently adopted Illinois Constitution of 1970. We take judicial notice of that Constitution and particularly of Sections 1, 2 and 3 of Article IV thereof; also of the relevant debates and proceedings of the Sixth Illinois Constitutional Convention which drafted the Constitution. These clearly show that Illinois has not by its Constitution established any standards governing congressional districting but that the new Constitution confines itself to provisions expressly limited to the method of districting the Senate and House of the Illinois General Assembly. Moreover, the teaching of Davis v. Mann, 377 U.S. 678, 84 S.Ct. 1441, 12 L.Ed.2d 609 (1964), is particularly appropriate here

and is authoritatively dispositive of respondents' argument. In *Mann* the Supreme Court, in addressing itself to the question of the relevance of state standards, said (377 U.S. 678 at 690–691, 84 S.Ct. 1441 at 1447):

"Appellants' contention that the court below should have abstained so as to permit a state court to decide the questions of state law involved in this litigation is without merit. Where a federal court's jurisdiction is properly invoked, and the relevant state constitutional and statutory provisions are plain and unambiguous, there is no necessity for the federal court to abstain pending determination of the state law questions in a state court. McNeese v. Board of Education, 373 U.S. 668 [83 S.Ct. 1433, 10 L.Ed.2d 622]. This is especially so where, as here, no state proceeding had been instituted or was pending when the District Court's jurisdiction was invoked. We conclude that the court below did not err in refusing to dismiss the proceeding or stay its action pending recourse to the state courts."

Respondents' appeal to vague and amorphous considerations of "public policy" in seeking to find new state standards for congressional districting in unrelated provisions of the Illinois Constitution is without merit.

■ Certain respondents assert herein that a three-judge court was not required to be convened in this case under 28 U.S.C. § 2284. A similar contention in a motion for mandamus and prohibition in the Circuit Court of Appeals for the Seventh Circuit on November 8, 1971, was summarily rejected by a panel of that Court. Dixon v. Castle, No. 71–1788. We are satisfied that under proper interpretation of Section 2284 and the nature of the instant case, our three-judge court was properly constituted and had complete jurisdiction.

■ We are unaware of any reapportionment case brought before a United States District Court which was not in fact heard by a three-judge panel

pursuant to that section. The jurisdiction of a three-judge court convened under Section 2284 continues through the grant or denial of the remedy that is sought. Stout v. Hendricks, 235 F.Supp. 556, 558 (S.D.Ind.1964). Jurisdiction to review any judgment of this three-judge court lies in the United States Supreme Court pursuant to 28 U.S.C. § 1253.

Our brother Campbell has filed herein a vigorous dissent in connection with the restraining order of November 5, 1971. We believe that his dissent rests upon an incorrect reading of the authorities he has cited and overlooks fundamental considerations of comity which should govern the relations of courts.

First and foremost, we regret his charge that the majority would intimidate the Supreme Court of Illinois, for indeed this is not our intent. To the contrary, we seek to maintain a most cordial and respectful relationship with that distinguished court, and we simply desire to avoid any conflict which could result only to the detriment of each tribunal were respondents to continue their effort to place us both upon a collision course.

The situation here is not as it would have been had the jurisdiction of the Supreme Court of Illinois been invoked during the course of our proceedings in the instant case and before the entry of our final order of September 21, 1971. In that context, the teachings of Germano v. Scott, *supra*, would have suggested the possibility of abstention, but that certainly is not the posture in which this case existed when Germano, et al., filed their proceeding in the Illinois court. Respondents Germano, et al., sat upon the sidelines throughout the pendency of this case. They offered no assistance to this court, nor did they take any independent action in any state court intended to provide constitutional and timely solutions to the complex problems which we faced in this matter of congressional redistricting.

By now permanently enjoining said respondents, we seek not alone to protect

and effectuate our judgment of September 21, 1971, but also to avoid an imposition upon the Illinois Supreme Court which in this eleventh hour of the preparations for the 1972 congressional elections would bring only grave and irreparable damage were respondents to proceed unrestrained.

We believe that whoever would seek needlessly to create an unseemly conflict between the two courts would evidence indeed a total lack of understanding of the meaning and purposes sought to be served by the principle of comity.

Section 2283 in essence is a statutory enactment of the doctrine of comity. Wells Fargo v. Taylor, 254 U.S. 175, 183, 41 S.Ct. 93, 65 L.Ed. 205 (1920); Oklahoma Packing Co. v. Oklahoma Gas and Electric Co., 309 U.S. 4, 8–9, 60 S.Ct. 215, 84 L.Ed. 447 (1940); Landry v. Daley, 288 F.Supp. 200 (N.D.Ill.1968). A Section 2283 injunction in this case would effectuate the doctrine of comity by prohibiting these respondents from drawing the federal and state judicial systems into needless conflict. It would prevent a confrontation which would threaten the integrity of this court's judgment; and it would avoid relitigation of a case fully adjudicated. Commerce Oil Refining Corp. v. Miner, 303 F.2d 125, 127 (1st Cir. 1962).

Our brother Campbell has also mistakenly read Atlantic Coastline Railroad Co. v. Brotherhood of Locomotive Engineers, 398 U.S. 281, 90 S.Ct. 1739, 26 L.Ed.2d 234 (1970), in which he places much reliance. There are a number of distinguishing aspects of that case; but the marked difference is that the district court there involved had not entered any prior judgment or order which was sought to be protected and effectuated under the express exception of 28 U.S.C. § 2283. In fact that case lends support to our view.

In critically analyzing that decision, it becomes quite clear that it is distinguishable from the case at bar in several respects. First, the district court injunction in that case was designed to nullify an existing state court injunction, while in the case at bar there is no such existing injunction, and there is, as yet, not even any state court action. Further, in *Atlantic*, the initial district court action only implied that the state court should not act, while the opinion in this case made it quite clear that this court had fully disposed of all of the pending issues. Finally, the Court there points out that "both exceptions to the general prohibition of § 2283 imply that some federal injunctive relief may be necessary to prevent a state court from so interfering with a federal court's consideration or *disposition* of a case as to seriously impair the federal court's *flexibility and authority* to decide that case." (Emphasis ours.)

Likewise, our brother Campbell ignores the major thrust of Moss v. Burkhart, 220 F.Supp. 149 (W.D.Okla.1968), which we submit is a clear authority for our permanent injunction under Section 2283. While it is true that the district court in Moss v. Burkhart did defer to the Oklahoma Supreme Court on the simple question of the size of a vote required to adopt an initiative referendum, a public proposal calling for a legislative redistricting commission, that court certainly did not abstain in the matter of protecting its judgment against a collateral and superseding attack sought to be carried forward in the Oklahoma Supreme Court. It is significant that the district court's injunction, preventing all persons from proceeding further in the Oklahoma Supreme Court, was left undisturbed by the United States Supreme Court. See also, Reynolds v. State Election Board, 233 F.Supp. 323 (W.D.Okla. 1964).

It is in this context of equitable and jurisdictional considerations that we feel that we are clearly authorized by 28 U.S.C. § 2283 to enter the permanent injunction sought. Furthermore, we believe that in the circumstances of this case, the protection of the rights of the plaintiffs and of all the citizens of Illinois similarly situated, as well as the due and effective administration of justice, require the avoidance of the unseemly

conflict which the respondents seek to create to the damage of the due and effective administration of justice. This conflict will be avoided by the protection and effectuation of our order of September 21, 1971.

Therefore, in view of these equitable and jurisdictional considerations, we enter the following order:

## INJUNCTION ORDER

This matter having come on for further hearing upon this court's order of November 5, 1971, granting defendant, State Electoral Board's motion for a temporary restraining order, and giving leave for the filing of responsive pleadings to defendant's motion on or before November 9, 1971, and setting the consolidated issues of preliminary and permanent injunctive relief requested by said defendant for hearing on November 11, 1971;

This Court finds, that on September 21, 1971, the three-judge panel of Judges Castle, Campbell and Decker entered its final order in the matter of Skolnick v. State Electoral Board of Illinois, 69 C. 755, adopting a congressional redistricting plan and ordering the defendant, State Electoral Board of Illinois, to comply with the apportionment plan so adopted, said order having been entered after a full hearing during which evidence was heard and all interested persons or parties were given the opportunity to be heard or testify, and from which order no appeal has been taken; that the said proceedings in this court were well publicized, but neither Edward V. Hanrahan nor any of the petitioners in the Germano, et al., mandamus action sought leave to intervene or appeared before this court in connection therewith.

On or about October 5, 1971, a "Motion for Leave to File Petition for Supplementary Relief in the Matter of Apportionment of Illinois Congressional Districts and for the Substitution and Addition of Parties or, in the Alternative, Original Petition for Writ of Mandamus" was filed with the Clerk of the Illinois Supreme Court by petitioners Joseph Germano, John Alesia, Joseph Cesario, Sam E. Perish and Buddy W. Davis against respondent members of the State Electoral Board of Illinois: Richard B. Ogilvie, Governor; William J. Scott, Attorney General; Alan J. Dixon, Treasurer; Michael J. Howlett, Auditor; James A. Ronan, Chairman, Democratic State Central Committee; and Victor L. Smith, Chairman, Republican State Central Committee, which petition or motions seek to modify, supersede, set aside or nullify the September 21, 1971, order of this court; the relief prayed for being:

" . . . that a writ of mandamus issue forthwith against the respondent Lewis directing him to immediately take the following action: to advise all persons inquiring about Congressional nominating procedures of this proceeding and inform such persons that no nominating petitions should be circulated, except in Districts yet to be approved by this Court.

"Petitioners further pray that this Court retain jurisdiction of this cause for the purpose of taking such affirmative action as may be necessary to assure that the 1972 Illinois Congressional elections take place only pursuant to a districting plan approved by this Court."

On or about October 14, 1971, the Supreme Court of Illinois allowed the above-named petitioners leave to file an original petition for mandamus under No. 44728, but did not grant petitioners leave to file a petition for supplementary relief in case No. 39201 (reported as Scott v. Kerner, 32 Ill.2d 539, 208 N.E.2d 561 (1965)). Said order of the Illinois Supreme Court directed the respondents to file their answer to the petition on or before October 26, 1971, whereupon petitioners could file their reply on or before November 5, 1971, with oral argument to be heard in Springfield on November 9, 1971.

On or about October 14, 1971, Edward V. Hanrahan, State's Attorney of Cook

County, on behalf of himself and Edward J. Barrett, County Clerk, filed a "Motion for Leave to File an Original Petition for Writ of Mandamus and Supporting Suggestions" with the Clerk of the Supreme Court of Illinois, which petition asked that the Illinois Supreme Court direct the defendant Electoral Board not to conduct an election pursuant to this court's order entered September 21, 1971, and that the Secretary of State be directed to advise any interested persons that, among other things, the districts established by this court are unconstitutional.

On October 26, 1971, pursuant to the order of the Illinois Supreme Court, the members of the State Electoral Board filed their "Answer and Suggestions" with the Illinois Supreme Court, setting out, among other things, that a petition for original mandamus was without authority in that the petition sought a declaratory judgment as to this court's order and that declaratory judgment was not a method of relief subject to the original jurisdiction of the Supreme Court of Illinois. The "Answer" further pointed out that the petition was filed after the entry of our order and would be determined only one month from when candidates' nominating petitions were to be filed. Said "Answer" also makes the observation that the new Constitution of Illinois is totally silent as to congressional districts or redistricting, contrary to the allegations of petitioners that new Illinois standards governing congressional districting had been established by said Constitution of 1970.

On October 27, 1971, the Clerk of the Supreme Court of Illinois issued a letter to the Honorable Edward V. Hanrahan informing him that the Supreme Court of Illinois had denied his petition, filed on behalf of himself and Edward J. Barrett, for an original writ of mandamus; however, leave was given to Mr. Hanrahan to appear as amicus curiae in case No. 44728 filed by petitioners Joseph Germano, et al.

In addition to the parties and movants herein or their attorneys, Edward V. Hanrahan and Joseph Germano, et al., were represented by their counsel and heard by this court, and John E. Cassidy, though not a party or intervenor to this matter, was given leave to argue to this court as a private attorney on behalf of Alan J. Dixon, Michael J. Howlett, James A. Ronan, as individuals, which he declined to do, with regard to the motion for a preliminary or permanent injunction.

This court finds that the matter of congressional redistricting is one of general public importance and that the issues raised herein are of vital importance to the people of Illinois and to the many persons who may desire to seek election to the House of Representatives of the United States Congress from Illinois and the supporters of such candidates. We also take judicial notice of the fact that all candidates and their supporters must make their campaign plans well in advance of filing dates for nominating petitions and that the minority group or independent candidates are faced with a more difficult burden of advance preparation than that of the two established political parties.

This court finds that the case of Scott v. Germano, 381 U.S. 407, 85 S.Ct. 1525, 14 L.Ed.2d 477 (1965), is not applicable to Skolnick v. State Electoral Board, 69 C. 755, for the many reasons set out in our memorandum. We also find that the principle of concurrent jurisdiction does not affect our judgment under the facts and circumstances of this case and that having deferred remedial action to the state agencies for a considerable length of time and until we could wait no longer, that there is no requirement that our judgment be reviewed by the Illinois Supreme Court.

We find that 28 U.S.C. §§ 2283 and 1651 provide ample authority for the entry of a temporary restraining order and, upon further hearing, a permanent injunction under the circumstances of this case. We recognize that caution and discretion are the watchwords of § 2283, but on balance, we find the necessity and duty to provide Illinois with an

orderly electoral process far outweigh any objections to invoking this section.

We take judicial notice of the ten year history of inaction by the Illinois legislature with regard to congressional redistricting; the in-court admission before this panel by a member of the Illinois House of Representatives that redistricting by the legislature in the near future is unlikely; the fact that the legislature adjourned its fall term on November 13, 1971; that the Illinois Constitution (1970) does not require the legislature to reconvene until the second Wednesday of January, 1972; and that no congressional redistricting plan formulated by the Illinois General Assembly is likely to be enacted and become law in time for compliance with the filing dates for nominating petitions for the March 1972 primary election.

We conclude that this court was properly convened, and upon a finding of unconstitutionality as to the 1965 congressional district plan and absent timely remedial action by an agency of the State of Illinois, it was our duty to effect a plan to replace what had been found invalid, and that once adopted said plan must govern the election of United States Representatives from Illinois until the Illinois General Assembly does in fact timely adopt its own constitutional plan. We further conclude that irreparable injury to the people, electors, candidates and their supporters would result if we did not permanently enjoin the subject of this order and see that our order of September 21, 1971, is carried out.

It is hereby ordered, therefore, that all parties and the amicus curiae in the matter entitled People ex rel. Joseph Germano v. John W. Lewis, No. 44728, in the Supreme Court of Illinois, specifically Joseph Germano, John Alesia, Joseph Cesario, Sam E. Perish and Buddy W. Davis, petitioners, Edward V. Hanrahan, amicus curiae, John W. Lewis, Secretary of State, Richard B. Ogilvie, Governor, William J. Scott, Attorney General, Alan J. Dixon, Treasurer, Michael J. Howlett, Auditor, James A. Ronan, Chairman, Democratic State Central Committee, and Victor L. Smith, Chairman, Republican State Central Committee, respondents and members of the State Electoral Board of Illinois, their officers, agents, employees and attorneys and all other persons having knowledge of this court's order herein, be, and are hereby, permanently restrained and enjoined from further proceeding in the above-entitled action now before the Illinois Supreme Court or from filing any new actions affecting the matters herein in issue or in any way interfering with the electoral process applicable to congressional elections or the terms of our order of September 21, 1971, above referred to, and all persons are restrained and enjoined from taking any actions designed to or which will have the effect of interfering with the carrying out of said order, except as may be provided by law for the appeal of the order of September 21, 1971, or this order to the Supreme Court of the United States.

It is further ordered that the defendant, State Electoral Board of Illinois, its successor or successors, and all those acting by and under its authority, are hereby ordered and directed to accept filings and conduct elections, only in accordance with the provisions of the September 21, 1971, order of this court adopting a congressional redistricting plan, and in conformity with the election statutes of the State of Illinois which are not inconsistent therewith. The said Board and those acting by and under its authority are enjoined from accepting filings otherwise than in conformity with said order, from declaring the results of any such election held otherwise than in conformity with the said order of this court.

Jurisdiction is retained for the purpose of making any further orders deemed necessary to insure the effectuation of our order adopting a congressional redistricting plan, and this order permanently enjoining interference with said redistricting plan.

CAMPBELL, Senior District Judge, objects to the entry of this order and dissents therefrom.

CAMPBELL, Senior District Judge (dissenting):

As was revealed at the hearing on this motion on November 11th, I took the position in the conference of this judicial panel immediately following the initial hearing last September that the only action this court could or should take was to approve the one plan based upon numerical up-dating of our original plan of 1965 to achieve constitutional numerical equality in its Congressional districts. I further proposed at that conference to submit such plan once again to the Illinois Supreme Court for joint promulgation by both courts, exactly as the same two courts did with the original re-apportionment of the same Congressional districts in 1965, (Kirby v. Illinois State Electoral Board, 251 F.Supp. 908, People ex rel. Scott v. Kerner, 33 Ill.2d 460, 211 N.E.2d 736). I still conclude and here reiterate that the foregoing represents the limit of our jurisdiction in this particular re-apportionment case regardless of what greater jurisdiction might possibly exist in some other case lacking the dual jurisdictional precedent confronting us here.

I warned my brothers of this panel in that same conference last September that to do otherwise would not only exceed our authority but would upset perhaps permanently the outstanding comity that has always existed, not only in re-apportionment but in all matters, between the courts of the State of Illinois and this court ever since its creation by the Congress. From all that I saw and heard from both sides of the bar at the hearing just concluded this unfortunate result has been achieved by the injunction issued herein by the majority over my continuing dissent.

In support of my objections to the unwarranted and imperious action taken by my brothers I here re-adopt without restatement all of the findings and conclusions contained in my memoranda of September 21st and November 10th herein. I hereby further find and conclude that Section 2283 as construed by the courts has never sanctioned a federal court injunction against state judicial activity merely on the possibility of conflicting impact of final state and federal orders, which is the ground relied upon by my brothers for this mischievous injunction. Atlantic Coastline Railroad v. Brotherhood of Locomotive Engineers, 398 U.S. 281, 90 S.Ct. 1739, 26 L.Ed.2d 234 clearly teaches that even where, as in that case, the final orders of state and federal courts are directly in opposition (a situation which the majority seems only to guess might happen here) a federal restraint upon the state is forbidden because the pathways leading to the conflicting orders are distinct. (See also application of the *Atlantic Coastline* dichotomy to re-apportionment in *Moss*, 220 F.Supp. 149 and *Lomenzo*, 238 F. Supp. 916). In our case we clearly have such separate considerations to be undertaken by this court and by the Supreme Court of Illinois. Indeed, my brothers themselves so find when they hold in their memorandum of September 21st (pp. 6 and 7) herein that the vital issues of contiguity and compactness of Congressional districts are beyond federal judicial determination. Of course these issues, indispensable to valid reapportionment, belong solely to the State (Reynolds v. Sims, 377 U.S. 533 at pp. 578 and 579, 84 S.Ct. 1362, 12 L.Ed. 2d 506) and in our case can only be determined by the Supreme Court of Illinois whose hands the majority seek by their injunction to tie in defiance of the teachings of *Atlantic Coastline* (supra).

I protest and I dissent!